982 A.2d 420

LITTON INDUSTRIES, INC. AND LITTON SYSTEMS, INC., PLAIN-
TIFFS–RESPONDENTS AND CROSS–APPELLANTS, v. IMO IN-
DUSTRIES, INC., VARO, INC., BAIRD CORPORATION AND
OPTIC–ELECTRONIC INTERNATIONAL, INC., DEFEN-
DANTS–APPELLANTS AND CROSS–RESPONDENTS.

Argued December 2, 2008—Decided November 2, 2009.

374

*George C. Lamb, III,* a member of the Texas bar, argued the cause for appellants and cross-respondents (*Duane Morris,* attorneys; *Frank A. Luchak,* on the briefs).

*James T. Smith,* argued the cause for respondents and cross-appellants (*Blank Rome,* attorneys; *Mr. Smith, Stephen M. Orlofsky* and *Anthony Merlino,* on the briefs).

PER CURIAM.

The principal issue in this appeal is the award and computation of attorneys' fees arising out of a breach of contract action. Plaintiffs sought $9 million in damages for the alleged breach of two provisions in the contract and for fraud. The jury found that defendants breached one provision of the contract, rejected plaintiffs' other claims, and awarded plaintiffs $2.3 million in damages. The trial court determined that the contract provided for attorneys' fees and costs and awarded plaintiffs $3,858,725 in attorneys' fees, $896,920 in experts' fees, $180,718 in consultants' fees, and $1,039,540 in costs, as well as prejudgment interest.

The Appellate Division essentially affirmed, but remanded on an issue not relevant to this appeal. We granted both defendants' petition for certification related to the attorneys' fees and costs, and plaintiffs' cross-petition related to the calculation of prejudgment interest and two asserted trial errors. We reverse in part and remand. We hold that the agreement provided for attorneys' fees and costs and that the amount of the fee award is governed by traditional principles applicable to attorneys' fee awards, within the context of the contract. We also hold that the trial court did not abuse its discretion in the amount awarded for prejudgment interest or commit error in the claimed trial deviations.

I.

The underlying litigation centered on a complex contract between plaintiffs Litton Industries, Inc. and Litton Systems, Inc. (collectively Litton or plaintiffs), and defendants IMO Industries,

Inc., Varo, Inc., Baird Corporation, and Optic Electronic International, Inc. (collectively defendants). In May 1995, plaintiffs agreed to purchase certain assets of defendants' optical system business for $52 million. The Purchase and Sale Agreement (Agreement) provided for a transfer date of June 2, 1995. Defendants warranted that they did not reasonably anticipate that any of their government bids or contracts would result in a loss and agreed not to submit any government bid or contract that they estimated in good faith would result in a loss during the period before the transfer date.

Prior to the transfer date, defendants submitted a bid to the United States Army for the refurbishment and manufacture of certain military equipment. The transfer occurred in early June 1995, and shortly thereafter the Army awarded the military equipment contract to defendants. The Army contract ultimately resulted in a huge financial loss for plaintiffs.

On May 8, 1997, plaintiffs filed a complaint against defendants alleging that they lost approximately $16 million in fulfilling the obligations under the Army contract on which defendants improperly bid. Plaintiffs initially made two claims: breach of § 3.12(a)(iv) of the Agreement and a fraud claim based on the same alleged breach. Section 3.12(a)(iv) provided in part that

[e]xcept as described on Schedule 3.12(a)(iv), none of the Government Contracts, Sales Contracts, Bids or Government Bids of the Sellers with respect to the Business is *reasonably anticipated* to result in a Contract Loss upon completion of performance. .

[(emphasis added).]

Plaintiffs asserted that defendants breached that provision because they should have anticipated a loss on the bid submitted to the Army.

In June 2003, plaintiffs moved to amend their complaint to include an additional claim based on the alleged violation of § 5.3(ii) of the Agreement, which prohibited defendants from making any government bid or contract that they estimated in

good faith would result in a loss.   Section 5.3 of the Agreement
provided in part that

> [e]xcept as otherwise may be required by Applicable Law, Antitrust Law, or
> Government Contract Law, the Sellers shall not, without the prior consent of
> Litton ... make or enter into any Contract, Government Bid or Bid respecting ...
> (ii) Contracts for which the total cost estimate at the time of execution thereof or at
> the time of the Government Bid or Bid, as the case may be, as estimated in good
> faith by the Sellers, would result in a net loss on the applicable Contract....

At trial plaintiffs sought $9,022,042 for the claims based on the
theories of fraud and breach of both § 3.12(a)(iv) and § 5.3(ii) of
the Agreement.   Ultimately, plaintiffs prevailed on the breach of
contract claim premised on § 5.3(ii), but the jury rejected all other
claims.   The jury awarded plaintiffs $2.3 million in damages, which
the parties agreed to reduce to $2.1 million to correct an error.

Defendants moved for judgment notwithstanding the verdict,
and plaintiffs filed a motion to recover attorneys' fees and costs in
the amount of $6,411,354.   Section 11.1 of the Agreement provided
that defendants agreed to indemnify and reimburse plaintiffs for

> any and all Losses suffered or incurred by the Buying interest (whether suffered
> or incurred with respect to any Third-Party Claim or otherwise) and resulting
> from or arising out of each of the following:
>
> ....
>
> (b) Breach of Covenant of Agreement
>
> Any breach of nonfulfillment by [defendant] or any Seller of any of their covenants,
> agreements, or other obligations set forth in this Agreement....

"Losses" is defined in the Agreement as "all demands, claims ...
actions or causes of action ... losses, damages, costs, expenses,
liabilities, judgments, awards ... and amounts paid in settlement
(including reasonable attorneys' fees and costs incident to any of
the foregoing)...."

The trial court denied defendants' motion for judgment notwith-
standing the verdict and appointed a Special Master [1] on the issue
of attorneys' fees.   Specifically, the trial court asked the Special
Master

---

[1] Former Justice Stewart Pollock was appointed Special Master.

to determine and recommend ... a lodestar amount for the attorneys['] fees and costs reasonably incurred by Plaintiffs in the litigation of their claim under [s]ection 5.3(ii) of the [Agreement], the claim on which the Plaintiffs prevailed at trial. The Court will conduct its proportionality analysis and determine the amount of any fee award, so the Special Master need only determine the lodestar amount for that claim.

The Special Master found that plaintiffs' claims under § 3.12 and § 5.3 arose from a "common core of facts" and that those claims were so interrelated that the legal services on the § 3.12 claim were to be included in the lodestar amount for the § 5.3 claim. The Special Master focused on the fact plaintiffs would have had to establish the same proofs to succeed on a claim under either § 3.12 or § 5.3. The Special Master determined that the attorneys' fees and costs would be better adjusted through a proportionality analysis than by parsing out each and every fee from the intermingled claims, and that a reduction was necessary for the failed fraud claim. Because the fraud claim was one of plaintiffs' three basic claims, the Special Master found it would be fair and reasonable to reduce plaintiffs' request for attorneys' fees by one-third. The Special Master also reduced plaintiffs' request for costs by a similar amount. After calculating the reduction, the Special Master recommended an award of $2,971,295 for attorneys' fees and $693,026.96 for costs.

The trial court received the Special Master's report and rendered a decision on September 13, 2006. The court denied defendants' motion for judgment notwithstanding the verdict, and awarded plaintiffs legal fees, costs, and prejudgment interest at a simple rate of interest from the date of commencement of the litigation. In addressing the legal fees, the trial court agreed with the Special Master that the contractual claims under § 3.12 and § 5.3 constituted a "common core of facts." The trial court explained that

[t]he claims themselves are inextricably intertwined . The claims relate and overlap and it is impossible to envision a manner of separating the legal work and expenses associated with one claim from the other. It simply cannot be done. They indeed are based upon a common core. Accordingly, and without qualification, this court finds that the legal work, costs and expenses attributable to the two

contractual claims may be attributed entirely to the § 5.3(ii) claim for purposes of determining the [lode]star.

However, the trial court rejected the Special Master's conclusion that the fraud claim represented an equal one-third amount of legal work, expenses and costs, as compared to the two contractual claims. The court found that the fraud claim could be easily separated and required markedly less work than the contractual claims. The court accepted the itemized reductions proposed by plaintiffs' counsel and ordered a total fee offset for the fraud claim of $226,250. The court approved a lodestar of $4,287,472, and concluded that plaintiffs' costs of $1,039,540 were fully allocated to their successful claim, as were the experts' fees of $896,920, and the consultants' fees of $180,718.

The trial court next discussed proportionality:

Generally, a proportionality analysis relates to a modification of a [lode]star fee, by virtue of fee-shifting statutes, in order to accommodate the level of success achieved in litigation. Here, the basis for the fee application is the [Agreement] and the [lode]star computation work was performed by a [S]pecial [M]aster as a result of rare agreement between the parties as embodied in the appointing order dated April 15, 2005. . . .

[E]xpert and consultant fees have been determined. Costs in [the] amount of $1,039,540.00 have been found to be intrinsically reasonable and fully allocated to [plaintiffs'] successful jury award. Therefore, the proportionality adjustment pertains to the attorneys' fees alone.

In its proportionality analysis the court reasoned that

[a] critical consideration in the required analysis is the relationship of the success realized as compared to the amount of damages sought. A meaningful difference exists between the two in this case. [Plaintiffs] asked for damages of more than $9 million and [were] rewarded with a verdict of $2.3 million. Even [plaintiffs'] expert on this issue obliquely expressed an understanding that a partial reduction of attorneys' fees would be forthcoming. This is an accurate forecast. The question, of course, is by what amount?

The answer is not the product of a mathematical computation resulting in a percentage based on a comparison of prospectively recoverable damages to damages recovered in fact. While this relationship unquestionably is important, an answer is dependent on a complex of other considerations, including those factors referenced in RPC 1.5.

The trial court noted that the litigation was extremely complex, required lengthy discovery and intense trial preparation, resulted

in a long trial, and that "[c]ompetent counsel expended much energy and a great number of legal hours, reasonable legal hours, successfully pursing legal redress against [defendants] because there was no alternative." The court concluded that there was no justification to greatly modify plaintiffs' fee request and determined that a reduction of ten percent was both fair and reasonable. Consequently, the court deducted ten percent from the lodestar of $4,287,472 to arrive at an attorneys' fee award of $3,858,725. With the approved costs of $1,039,540, experts' fees of $896,920, and consultants' fees of $180,718, the trial court awarded plaintiffs a total of $5,975,903 in attorneys' fees and costs. Further, the court found that this was an appropriate case for the award of prejudgment interest and looked to the tort model as a guide to award plaintiffs simple interest commencing as of the filing date of the original complaint.

In the amended judgment, the court entered judgment in favor of plaintiffs in the amount of $8,886,407.03, as follows:

a. $2,100,000.00 on the jury's verdict for compensatory damages;

b. Prejudgment interest awarded pursuant to R. 4:42–11(a)(ii), in the amount of $810,504.03 (calculated on the amount of the compensatory award of $2,100,000.00 from the date of the filing of the Complaint on May 8, 1997 through October 6, 2006); and

c. Attorneys' fees, expenses and costs of litigation awarded in the amount of $5,975,903.00.

Both sides appealed. In an unpublished opinion, the Appellate Division reversed in part, and remanded for trial limited to plaintiffs' claim for administrative expenses and lost profits associated with their successful contract claim. In all other respects, the Appellate Division affirmed the judgment of the trial court, and granted a stay of execution on the final amended judgment.

The panel found that the definition of "losses" in the Agreement clearly included attorneys' fees in connection with litigation, and that the trial court's "common core of facts" analysis was supported by the record. Further, the panel agreed with the trial court that the fraud claim was easily separated from the other claims, and that the legal time associated with that claim did not

account for a large portion of the legal work. The panel approved the calculation of the lodestar and noted that the trial court "critically considered" the large difference between the amount of damages sought and the amount actually recovered. Although the panel stated that it might have arrived at a different result than the trial court, it concluded that in light of the trial court's consideration of all the appropriate factors, there was no abuse of discretion in the amount of legal fees and costs awarded.

In respect of plaintiffs' cross-appeal, the panel affirmed the trial court's award of prejudgment interest at a simple interest rate and rejected plaintiffs' multiple allegations of trial error.

We granted defendants' petition and plaintiffs' cross-petition. 195 *N.J.* 522, 950 *A.*2d 908, 195 *N.J.* 522, 950 *A.*2d 908 (2008).

## II.

Defendants contend that it was error to award fees to plaintiffs because the Agreement lacked a clear fee-shifting provision. Further, defendants urge that even if an award of attorneys' fees was required by the Agreement, the trial court: improperly failed to reduce the award to eliminate fees for services related to unsuccessful claims; improperly applied the "common core" doctrine that was developed for statutory, not contractual, fee-shifting provisions; improperly performed the proportionality analysis of the lodestar in a contractual fee-shifting case; and improperly failed to apply the proportionality analysis to the costs.

Plaintiffs counter that the Agreement explicitly provided for attorneys' fees and costs, and that the award was appropriate and consistent with this Court's fee-shifting jurisprudence.

In their cross-petition, plaintiffs argue that the trial court erred by failing to apply the tort interest-rate rule that permits an additional two percent above the otherwise prescribed interest rate. Plaintiffs also argue that the trial court erred in excluding portions of witness testimony in the readback to the jury, and in its treatment of plaintiffs' counsel during closing arguments when

the court instructed the jury to disregard a portion of counsel's closing argument.

In response, defendants assert that plaintiffs have shown no manifest denial of justice to support their claim for enhancement of the prejudgment interest award, and that the trial court did not err in its treatment of the evidentiary readback issue or counsel's closing arguments.

### III.

In general, New Jersey disfavors the shifting of attorneys' fees. *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.,* 158 *N.J.* 561, 569, 730 *A.2d* 843 (1999). However, "a prevailing party can recover those fees if they are expressly provided for by statute, court rule, or contract." *Packard–Bamberger & Co., Inc. v. Collier,* 167 *N.J.* 427, 440, 771 *A.2d* 1194 (2001). When the fee-shifting is controlled by a contractual provision, the provision should be strictly construed in light of our general policy disfavoring the award of attorneys' fees. *See N. Bergen, supra,* 158 *N.J.* at 570, 730 *A.2d* 843.

The focus in this case is the contractual provision in the agreement that required defendants to reimburse plaintiffs for "losses" arising out of any breach of the Agreement. "Losses" were defined as "all demands, claims, claims for reimbursement, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards ... and amounts paid in settlement (including reasonable attorneys' fees and costs incident to any of the foregoing)...."

Defendants urge that the Agreement is not specific enough to warrant attorneys' fees. We disagree. The plain language in the Agreement provides that attorneys' fees and costs are included in the definition of "losses." Although the words "reasonable attorneys' fees and costs" are located in a parenthetical, that does not detract from the intent in the Agreement that attorneys' fees and costs would be recoverable as part of plaintiffs' losses. We are

satisfied that the trial court correctly concluded that the Agreement provided for attorneys' fees and costs in plaintiffs' successful breach of contract claim.

We next consider the dollar amount of the award. Preliminarily, we note that a reviewing court will disturb a trial court's award of counsel fees " 'only on the rarest of occasions, and then only because of a clear abuse of discretion.' " *Packard–Bamberger, supra,* 167 *N.J.* at 444, 771 *A.*2d 1194 (quoting *Rendine v. Pantzer,* 141 *N.J.* 292, 317, 661 *A.*2d 1202 (1995)).

We have applied the same test for reasonable attorneys' fees in contract cases that we use in other attorneys' fee award cases in New Jersey. *See N. Bergen, supra,* 158 *N.J.* at 570, 730 *A.*2d 843. In determining the reasonableness of an attorneys' fee award, the threshold issue "is whether the party seeking the fee prevailed in the litigation." *Ibid.* In that regard, the party must establish that the " 'lawsuit was causally related to securing the relief obtained; a fee award is justified if [the party's] efforts are a necessary and important factor in obtaining the relief.' " *Ibid.* (quoting *Singer v. State,* 95 *N.J.* 487, 494, 472 *A.*2d 138, *cert. denied,* 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L.Ed.*2d 64 (1984)).

In the present case, plaintiffs satisfied the tests for the award of fees. They prevailed on one of their breach of contract claims, and the contract required defendants to indemnify plaintiffs for their losses in the event of a breach.

The next step in determining the amount of the award is to calculate the "lodestar," which is that number of hours reasonably expended by the successful party's counsel in the litigation, multiplied by a reasonable hourly rate. *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 21, 860 *A.*2d 435 (2004). Rule of Professional Conduct 1.5(a) "commands that '[a] lawyer's fee shall be reasonable' in all cases, not just fee-shifting cases," *id.* at 21–22, 860 *A.*2d 435 (quoting *RPC* 1.5(a)), and requires courts to consider:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services;

(8) whether the fee is fixed or contingent.

[*RPC* 1.5(a).]

The computation of the lodestar mandates that the trial court determine the reasonableness of the hourly rate of "the prevailing attorney in comparison to rates 'for similar services by lawyers of reasonably comparable skill, experience, and reputation' in the community." *Furst, supra*, 182 *N.J.* at 22, 860 *A.*2d 435 (quoting *Rendine, supra*, 141 *N.J.* at 337, 661 *A.*2d 1202). Further, the court must consider the degree of success in determining the reasonableness of the time expended. *Furst, supra*, 182 *N.J.* at 23, 860 *A.*2d 435. Thus, when a party has succeeded on only some of its claims for relief, the trial court should reduce the lodestar to account for the limited success. *Ibid.* Moreover, if the same evidence adduced to support a successful claim was also offered on an unsuccessful claim, the court should consider whether it is nevertheless reasonable to award legal fees for the time expended on the unsuccessful claim.

Beyond the lodestar amount, in cases in which the fee requested far exceeds the damages recovered, "the trial court should consider the damages sought and the damages actually recovered." *Packard–Bamberger & Co., supra*, 167 *N.J.* at 446, 771 *A.*2d 1194. In addition to that proportionality analysis, the court must evaluate the reasonableness of the total fee requested as compared to the amount of the jury award. That is, when the amount actually recovered is less than the attorney's fee request, the court must consider that fact in determining the overall

reasonableness of the attorney's fee award. *Ibid.* To be sure, there is no precise formula for that portion of the reasonableness analysis. The ultimate goal is to approve a reasonable attorney's fee that is not excessive.

With those principles as our guide, we turn now to determine whether the trial court abused its discretion in evaluating plaintiffs' fee application. This is a contract case. Although the parties could have expressly provided in the contract what approach would be utilized, in the absence of express language in the agreement, we resort to our jurisprudence for attorneys' fee-shifting cases, which includes an analysis of the same evidence presented for both successful and unsuccessful claims. We do that in recognition of the fact that the parties to a contract are presumed to know the relevant legal principles and to have adopted them if they have not expressed a different understanding.

In § 3.12, defendants represented that they did not reasonably anticipate that any of their government bids would result in a loss, and in § 5.3, defendants agreed not to make any government bid that they reasonably estimated would result in a loss. The primary difference between the two was the timing of the bids. § 3.12 addressed bids that had already taken place when the contract was entered into and § 5.3 governed future bids. Here, the Special Master and the trial court each found a common core of facts that require the production of essentially the same evidence in evaluating the time spent on the successful and unsuccessful contract claims. We agree and affirm that conclusion.

The trial court found that the attorneys' fees related to the unsuccessful fraud claim were identifiable and therefore deleted that time from the award. That was appropriate.

The trial court further determined that an adjustment to the lodestar amount was necessary because the actual damages recovered were substantially less than the amount of damages sought. As found by the Appellate Division, the trial court

"critically considered" the large difference between the amount of damages sought and the amount actually recovered and reduced the fee by ten percent. However, it does not appear that the trial court also considered the large difference between the attorneys' fee requested and the amount actually recovered. Unlike the traditional fee-shifting case in which enhancement has some relevancy as a type of encouragement to represent a party, *see Rendine, supra,* 141 *N.J.* at 339, 661 *A.*2d 1202, the opposite applies in a contract case. That is, although enhancement is not a concern, the relationship between the fee requested and the damages recovered is a factor to be considered by the trial court because the notion of proportionality is integral to contract fee-shifting to meet the reasonable expectation of the parties.

Here, the trial court should have separately considered whether to reduce even more the amount of the fee in light of the fee request that exceeded the amount of the recovery. That analysis is necessarily fact-sensitive as there is no precise test or mathematical calculation for that adjustment. The trial court is in the best position to weigh the competing arguments in making any fee adjustment to ensure that the counsel fee award is reasonable.

On remand, in addition to plaintiffs' claim for administrative expenses and lost profits associated with their successful contract claim that must be retried, the trial court must reconsider the reasonableness of the attorneys' fee request in light of all of the factors noted herein.

**■** Lastly, defendants disagree with the trial court's award of all of plaintiffs' costs in light of their limited success. The trial court found that the costs were intrinsically related to the successful claim, and we find no contrary evidence to reach a different decision. Consequently, the trial court did not abuse its discretion in determining that the costs of $1,039,540 were reasonable and fully allocable to plaintiffs' successful jury award.

## IV.

### A.

We turn next to plaintiffs' cross-appeal. Plaintiffs contend that the trial court properly exercised its discretion to initially utilize the tort rate under *R.* 4:42–11(a)(ii) to award prejudgment interest, but that the court should add an additional 2% because the compensatory damages judgment exceeded "the monetary limit of the Special Civil Part and they are entitled to the higher rate of *R.* 4:42–11(a)(iii)." We disagree.

Although prejudgment interest in a tort action is expressly governed by *R.* 4:42–11(b), "the award of prejudgment interest on contract and equitable claims is based on equitable principles." *County of Essex v. First Union Nat'l Bank,* 186 *N.J.* 46, 61, 891 *A.*2d 600 (2006). Thus the award of prejudgment interest in a contract case is within the sound discretion of the trial court. Similarly, the rate at which prejudgment interest is calculated is within the discretion of the court. *See Musto v. Vidas,* 333 *N.J.Super.* 52, 74–75, 754 *A.*2d 586 (App.Div.2000). We have explained that the primary consideration in awarding prejudgment interest is that

> the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled.
>
> [*Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 506, 323 *A.*2d 495 (1974).]

Unless the allowance of prejudgment interest "represents a manifest denial of justice, an appellate court should not interfere." *County of Essex, supra,* 186 *N.J.* at 61, 891 *A.*2d 600 (internal quotation and citation omitted).

The trial court found that this was an appropriate case to award prejudgment interest, and neither side challenges that decision. Moreover, the trial court merely used *R.* 4:42–11 as a guide and ultimately concluded that there were no unusual circumstances "to

warrant an enhancement of the simple interest rate." The trial court's decision to choose the rate set by *R.* 4:42–11(a)(ii), without the enhancement added by subsection (a)(iii), was not a manifest denial of justice.

## B.

Plaintiffs next challenge the trial court's response to the jury's questions concerning the limitations of federal antitrust law as it may have impacted the Agreement.

Although the reading of all or part of a witness' testimony is within the discretion of the trial court, "in the absence of some unusual circumstance, the request should be granted." *State v. Wolf,* 44 *N.J.* 176, 185, 207 *A.*2d 670 (1965); *see also State v. Wilson,* 165 *N.J.* 657, 660, 762 *A.*2d 647 (2000). In *Wolf,* this Court reasoned that

[t]he true administration of justice calls for such action. Where there is a doubt in the minds of jurors as to what a witness said, it cannot be prejudicial to anyone to have that doubt removed by a rehearing of his testimony. There is no need to be chary for fear of giving undue prominence to the testimony of the witness. If under our system of trials a jury is to be considered intelligent enough to be entrusted with powers of decision, it must be assumed they have sense enough to ask to have their memories stimulated or refreshed only as to those portions of the testimony about which they are in doubt or disagreement. It must be assumed also that if they had any similar doubts or disagreements about statements of other witnesses they would seek the same remedy. If they do not ask for further reading there is no right in a party to demand it. The matter must be left in the sensitive discretion of the trial judge.

[*Wolf, supra,* 44 *N.J.* at 185, 207 *A.*2d 670.]

In the present case, during deliberations the jury initially asked, "what restrictions does [the federal act] have on closing a corporate purchase?" The question was related to the testimony of plaintiffs' witness, Thomas Hicks, as evidence of "reliance" on plaintiffs' fraud claim. Hicks had testified that plaintiffs did not review the Army bid prior to its submission because of the constraints placed on plaintiffs during the approval process.

After consultation with counsel, the trial court read certain portions of Hicks' testimony to the jury. The jury then asked

whether the act "forbid[s] [plaintiffs] from looking at [the] bid or was it [plaintiffs'] interpretation and their decision not to look at the bid? Does it actually forbid them, because of the pending deal, to stay away from it?" After considerable discussion with counsel, the court read additional portions of Hicks' direct and cross-examination that included his response that it was plaintiffs' choice not to look at the Army bid. The court then asked if the jury had any other follow-up questions. After no juror responded, the jury continued its deliberations.

Plaintiffs contend that the court erred in not reading another response by Hicks, in which he testified that "[i]t's not that we didn't look at it. We said, it's your business to operate. We can't look at it because of [federal] regulations, Hart–Scott, other things. We're afraid to get involved. We can't tell you how to run your business until you turn it over." In rejecting that request, the trial court exercised discretion in reasoning that the testimony was vague and would not help answer the jury's question.

The Appellate Division found no merit to plaintiffs' challenge and we agree with that conclusion. The trial court reviewed the jury's questions with counsel and ordered a readback of the relevant portions of Hicks' testimony on direct and cross-examination. The court fairly ascertained the portion of the testimony the jury wanted, and after the selected testimony was read, the court inquired if the jury had additional questions. Receiving no response, the trial court allowed the jury to continue its deliberation. Simply put, the trial court fairly and adequately responded to the jury's questions.

## C.

Plaintiffs further contend that the trial court erred when it interrupted plaintiffs' counsel's summation. The trial court has broad discretion in the conduct of the trial, including the scope of counsel's summation. The abuse of discretion standard applies to

the trial court's rulings during counsel's summation. *See Hisenaj v. Kuehner*, 194 *N.J.* 6, 12, 942 *A.2d* 769 (2008) ("In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion.").

Prior to closing arguments, plaintiffs' counsel sought permission to convey to the jury that defendants did not call as witnesses some of the persons on their witness list, and that the jury could draw an inference against defendants on that basis. Defendants' counsel replied that defendants could make a similar argument because plaintiffs had not called all of their witnesses. The trial court indicated that it was not inclined to permit plaintiffs' argument and counsel agreed to abide by the court's ruling.

After defendants presented their closing argument and complied with the court's ruling, plaintiffs' counsel in summation made several comments concerning defendants' failure to present certain witnesses or to introduce rebuttal experts to challenge the testimony of plaintiffs' numerous experts. Near the end of plaintiffs' summation, the trial court interrupted and instructed the jury to disregard counsel's comments.

> [Counsel]—you've stated several times now that people weren't brought in to challenge certain designs, certain equipment, certain cost[s], and so forth on down the line.
>
> The complaint, I will charge the jury, is brought by the plaintiff[s]. The plaintiff[s] [have] the burden to prove their complaint. . There is no burden on the part of the defendant[s]. They need not produce any witnesses whatsoever. They can rely on cross-examination and so forth.
>
> So to draw an inference supporting the plaintiff[s'] case because somebody was not produced here is unfair. It's wrong. Please disregard it. Follow my instruction.

Plaintiffs' counsel offered no objection and then completed his summation. However, during jury instructions, plaintiffs argued that the court's comments were prejudicial. The trial court disagreed, noting that both parties had previously agreed not to discuss the decision not to call certain witnesses.

We find no abuse of discretion in the trial court's limitation on plaintiffs' counsel's comments regarding defendants' failure to call certain witnesses. As the trial court noted, defendants were not

required to produce any experts, and the burden of proof was upon plaintiffs to establish that defendants breached the contract. The trial court's comments were a correct statement of the law.

## V.

The judgment of the Appellate Division is affirmed in part and reversed in part. We remand for the trial court to reconsider the reasonableness of the attorneys' fee award, after the retrial of the issue remanded by the Appellate Division, in accordance with the principles pronounced herein.

Justice RIVERA–SOTO, concurring in part and in the result.

This is a contract case.

That obvious, self-evident statement bears repeating because it is at odds with the two basic conclusions advanced by the majority in its counsel fee-shifting analysis: that, in a contract action where the measure of damages includes counsel fees, (1) recovery can be had on unsuccessful claims—claims on which no breach of contract has occurred—when they share a "common core" of facts or related legal theories with unsuccessful claims, *ante* at 387-88, 982 A.2d at 429,[1] and (2) after the lodestar is ascertained, a contractual award of counsel fees nevertheless must be "reasonable," *ante* at 389, 982 A.2d at 430.

The majority's approach, which imports wholesale concepts developed in the tort or statutory fee-shifting context, is ill-suited in a contract setting. In that discrete context, whether a counsel fee award is appropriate and, if so, in what amount, should be informed, but not rigidly governed, by the well-recognized methodology used in determining counsel fees awards—a lodestar analysis—followed by the application of traditional contract princi-

---

[1] Although the majority studiously avoids referring to its analysis as one based on a "common core," *see Singer v. State*, 95 *N.J.* 487, 500, 472 *A.*2d 138 (1984), its affirmance of the findings below that were reached using the "common core" analysis, *ante* at 388-89, 982 *A.*2d at 429-30, unveil the true nature and extent of the methodology adopted by the majority.

ples that eschew any enhancements and define the quantum of any recovery in terms of what is foreseeable. Because the majority fails to do so, I concur in the result.[2]

## I.

A purchase and sale of business assets between sophisticated commercial entities represented by able counsel that devolved into now more than twelve years of litigation, including a lengthy, contentious, and expensive trial, form the backdrop for this appeal. Yet, the core facts relevant to the issues presented in this appeal are stated simply. On May 11, 1995, plaintiff Litton Industries, Inc. entered into a written purchase and sale agreement (Agreement) with defendant IMO Industries Inc.[3] As provided in the recitals of the Agreement, plaintiff agreed to purchase from defendant so much of defendant's business as was "engaged in the business of designing, developing, manufacturing, and selling image intensifier night vision components and systems, laser products, and other optical systems for military applications, commercial customers, the U.S. Government, and certain foreign governments[.]" The Agreement did not contain a specified purchase price; instead, Section 1.4 described a mechanism for ascertaining the purchase price. According to the parties, the resulting purchase price under Section 1.4 was approximately $52 million.

On June 2, 1995, the parties closed on the Agreement, and the assets were transferred. However, plaintiff later sued defendant, setting forth, in general, three separate claims: the breach of two

[2] In all other respects-as raised in plaintiff's cross-appeal-I concur with the majority's reasoning and conclusions.

[3] Also listed as parties to the purchase and sale agreement, and later as parties to the lawsuit, were plaintiff's wholly owned subsidiary Litton Systems, Inc. (LSI); Baird Corporation (Baird) and Varo, Inc. (Varo), each a wholly owned subsidiary of defendant; and Optic–Electronic International, Inc. (OEII), a wholly owned subsidiary of Varo. For ease of reference, plaintiff and LSI are collectively referred to as "plaintiff" and defendant, Baird, Varo and OEII are collectively referred to as "defendant."

provisions of the Agreement, and fraud in respect of those contract breaches.[4]   In its breach of contract claims, plaintiff alleged that defendant had breached Sections 3.12(a)(iv) and 5.3(ii) of the Agreement, respectively.   Section 3.12(a)(iv) set forth defendant's representation and warranty that none of the sales contracts were "reasonably anticipated to result in a Contract Loss upon completion of performance" [5] (the "loss-leader" claim).   In a similar vein, Section 5.3(ii) of the Agreement limited defendant's actions during the interim between the date of the original purchase and sale agreement—May 11, 1995—and the actual closing date on the Agreement—June 2, 1995—and provided that defendant was forbidden from entering into any agreement "for which the total cost estimate ... as estimated in good faith by [defendant], would result in a net loss" (the "prohibited-contracts" claim).

After a hotly disputed jury trial that started on September 21, 2004, concluded on November 15, 2004, and covered over 5,500 transcript pages, the jury returned a unanimous verdict.   The jury found in defendant's favor in part, rejecting both plaintiff's loss-leader or Section 3.12(a)(iv) claim and plaintiff's fraud claim. However, in respect of plaintiff's prohibited-contracts or Section 5.3(ii) claim, the jury returned a verdict in plaintiff's favor and awarded $2.3 million in damages.   Defendant's motion for judgment notwithstanding the verdict was denied.   This factual setting provides the predicate for the limited issue in respect of counsel fees on which my disagreement with the majority is centered.

---

4 Plaintiff's complaint originally charged defendant with breach of contract; breach of contract in respect of misrepresentations made; fraudulent misrepresentations; negligent misrepresentations; breach of the implied covenant of good faith and fair dealing; unlawful conversion; unjust enrichment; imposition of a constructive trust; and punitive damages.   However, plaintiff later amended its complaint to consist solely of the two breach of contract claims and the fraud claim ultimately presented to the jury for its consideration.

5 Part I of Appendix I to the Agreement defines a "Contract Loss" as those instances where "the sales price ... is less than the sum of the cost incurred to date and the estimated cost to complete[.]"

After the verdict, plaintiff filed a motion for counsel fees and costs, invoking Section 11.1 of the Agreement. That Section provides, in relevant part, as follows:

**11.1   Indemnification by [defendant].**

In order to induce [plaintiff] to enter into this Agreement and to consummate the transactions contemplated hereby, [defendant] covenant[s] and agree[s] to and shall indemnify [plaintiff] and shall defend and hold [plaintiff] harmless against and with respect to (and shall reimburse [plaintiff] for) any and all Losses suffered or incurred by [plaintiff] (whether suffered or incurred with respect to any Third–Party Claim [6] or otherwise) and resulting from or arising out of each of the following:

. . . .

**(b)   Breach of Covenant or Agreement.**

Any breach or nonfulfillment by [defendant] of any of [its] covenants, agreements, or other obligations set forth in this Agreement[.]

The indemnity obligations of Section 11.1 are triggered by a crucial contractually defined term: "Loss." Part I of Appendix I to the Agreement defines "Loss" to "mean[ ] all demands, claims, claims for reimbursement, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges, and amounts paid in settlement (*including reasonable attorneys' fees and costs incident to any of the foregoing)*" (emphasis supplied). The lion's share of the post-verdict litigation between the parties centers on the meaning and effect of that definition.

Based on the indemnity and definitional sections of the Agreement, plaintiff sought an award of counsel fees and costs totaling almost $6.5 million. Defendant resisted that application, largely noting that plaintiff had been successful only in respect of one of three claims, and that its counsel fee application was procedurally deficient. With the consent of the parties, the trial court appointed a Special Master [7] "for the purpose of assisting the Court in

---

[6] Section 11.3 of the Agreement defines a "Third–Party Claim" as "any claim or demand by a third party." Because the claims asserted in this litigation are limited to those made between the parties to the Agreement, there are no Third–Party Claims at issue.

[7] The designated Special Master was the Honorable Stewart G. Pollock, a retired Justice of this Court.

determining the amount of attorney's fees, if any, to be awarded to the [plaintiff] in this case[.]" The Special Master was charged to review such documents, hear arguments of counsel, and take such other steps as the Special Master deems necessary and appropriate to determine and recommend to the Court a lodestar amount for the attorney's fees and costs reasonably incurred by [plaintiff] in the litigation of [its] claim under Section 5.3(ii) of the [Agreement], the claim on which [plaintiff] prevailed at trial.

The order of reference specifically provided, however, that "[t]he Court will conduct its proportionality analysis and determine the amount of any fee award, so the Special Master need only determine the lodestar amount for that claim."

The parties made their presentations to the Special Master. He concluded that "the § 5.3(ii) claim on which plaintiff[ ] recovered is sufficiently related to the other contractual claims, most notably the § 3.12(a)(iv) claim, to justify including all services and costs, including those for experts, in the lodestar for the § 5.3(ii) claim." He explained that he had "refrain[ed] from addressing the issue of proportionality, an issue that the trial court reserved in the Order of Reference." The Special Master acknowledged, however, that "[t]he interrelationship between the contractual claims highlights the difficulty of identifying specific hours to be eliminated and suggests that the more appropriate means of adjusting the requested fee is through a proportionality analysis" (citing *Szczepanski v. Newcomb Med. Ctr., Inc.*, 141 *N.J.* 346, 356, 661 *A.2d* 1232 (1995)).

The Special Master reasoned that "the resolution of this matter depends not so much on a detailed examination of the individual time entries by [plaintiff]'s counsel as it does on an analysis of the relationship between the § 5.3(ii) claim and the other claims on which [plaintiff] sought relief." He found that plaintiff's "claims arise from 'a common core of facts' and that those claims so interrelate that the legal services on other contractual claims may be included in the lodestar for the § 5.3(ii) claim." He concluded that "all fees and costs—whether incurred before or after the assertion of the § 5.3(ii) claim and whether or not they specifically identify that claim—reasonably relate to the § 5.3(ii) claim for the

purpose of determining the lodestar." However, because plaintiff
had been unsuccessful in the pursuit of its fraud claim, the Special
Master endeavored to exclude from plaintiff's recovery "the fees
attributable to the claims for fraud and punitive damages, the
contingency fee agreement, and the interlocutory appeal." In
doing so, he determined to fix the lodestar at two-thirds of the
amount of counsel fees and expenses sought, reasoning as follows:

> The fraud claim was one of [plaintiff]'s three basic claims. It follows that a one-third reduction for the fraud and punitive damage[s] claims is both fair and reasonable. Likewise, a one-third reduction for costs related to the fraud and punitive damages claims is fair and reasonable. Accordingly the Special Master recommends that [plaintiff]'s request for attorney's fees be reduced by $1,504,-573.00–one-third from the total amount incurred, $4,513,721.39; and, [plaintiff]'s request for costs be reduced by $346,513.48–one-third from the total amount sought, $1,039,540.44. In addition, as [plaintiff] recognizes, $34,227.99 for attorney's fees on the contingency fee agreement and $3,625.00 for attorney's fees on the interlocutory appeal should be [added to the deductions for] the fraud and punitive damages claim. The sum of all deductions is $1,888,939.47, leaving a net sum of $2,971,295.00 for attorney's fees and $693,026.96 for costs.

Summing up, the Special Master noted that, consistent with his
charge, he did not address the issue of proportionality. He also
downplayed his rejection of many of defendant's objections, ob-
serving that "[p]resumably the resolution of [the proportionality]
issue will include many of the issues that trouble defendant[.]"
He included among them items "such as whether [plaintiff]'s
limited, but substantial, success should be considered, whether the
requested fee satisfies the requirements of *RPC* 1.5(a), whether
and to what extent the fee may exceed the amount recovered, and
whether the overall request is reasonable."

Adopting the Special Master's analytical framework, the trial
court found "without qualification ... that the legal work, costs
and expenses attributable to the two contractual claims may be
attributed entirely to the § 5.3(ii) claim for purposes of determin-
ing the [lodestar]." It accepted the "common core of facts"
analysis referenced by the Special Master due to the "impossibility
to allocate work, costs and expenses" among the three claims
plaintiff advanced, particularly as plaintiff had been unsuccessful
on two of them. In the trial court's view, the central issue was

"whether all of the work, costs and expenses, excluding that which may be allocated to [the] fraud [claim], were reasonable and warranted." It concluded that "there is nothing in the record or in the Special Master's report that would suggest otherwise."

However, the trial court rejected the Special Master's broadsword one-third/two-thirds apportionment of plaintiff's counsel fee claim. From the unique vantage point of having presided over the trial, the trial court observed that "[k]nowledge of the claims made, the discovery undertaken and the actual observed trial presentation does not allow for the conclusion that the fraud claim bears an equal one-third amount of the legal work, expenses and costs, on a quantitative basis, as do the two contractual claims." It explained that "[u]nlike the contractual claims, the fraud claim is capable of being evaluated separately and markedly is less involved [than] the contract claims, despite [defendant]'s assertion that the fraud claim should shoulder a greater share of the work, expenses and costs." It reasoned that "the contractual issues constitute not only the foundation but also the structure of this litigation and account for the vast majority of the legal effort and expenses associated with pursuing the matter." The trial court determined that, after appropriate offsets, "the resultant approved lodestar amount for legal fees is $4,287,472.00. Additionally, recommended expert fees of $896,920 . . . are approved, as are the recommended consultant fees in the amount of $180,718.00." The total counsel fees and costs thus preliminarily awarded to plaintiff was $5,365,110.

Shifting, then, to the application of a proportionality analysis, the trial court explained that "[g]enerally, a proportionality analysis relates to a modification of a [lodestar] fee, by virtue of fee-shifting statutes, in order to accommodate the level of success achieved in litigation[,]" noting that "the proportionality adjustment pertains to attorney's fees alone." After reviewing the elements customarily applied in determining whether to enhance or decrease a lodestar, the trial court concluded that "after lengthy consideration of the singular facts and circumstances

involved in this litigation, this court finds a reduction of 10% of the requested legal fee is both fair and reasonable. Consequently the awarded legal fee is in the amount of $3,858,725.00."

The trial court ultimately entered a final judgment[8] in favor of plaintiff and against defendant

in the amount of $8,886,407.03, which includes the following elements:

a. $2,100,000.00 on the jury's verdict for compensatory damages;[9]

b. Prejudgment interest awarded pursuant to *R.* 4:42–11(a)(ii), in the amount of $810,504.03 (calculated on the amount of the compensatory award of $2,100,000.00 from the date of the filing of the Complaint on May 8, 1997 through October 6, 2006); and

c. Attorney's fees, expenses and costs of litigation awarded in the amount of $5,975,903.00.

Defendant appealed, and plaintiff cross-appealed. Defendant raised four points on its direct appeal, including that the trial court's counsel fee award was either improper or excessive.

On the award of counsel fees to plaintiff, the Appellate Division first noted that Section 12.10 of the Agreement provided that it "shall be construed, interpreted, and enforced in accordance with the law of the State of Texas without regard to its choice of law principles and controlling United States federal law." The panel concluded, however, that "an award of counsel fees is procedural, and thus New Jersey law applies" (citing *N. Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 158 *N.J.* 561, 568–70, 730 *A.2d* 843 (1999)). It noted that "[t]hough New Jersey traditionally follows the 'American rule,' where each party is required to pay its own fees and other litigation expenses, *Rule* 4:42–9(a) recognizes certain exceptions" and that "[o]ne of those exceptions applies here, that is, where a claim is based on a contract, 'the rule does not preclude a party from agreeing by contract to pay attorneys'

---

[8] The trial court's original final judgment later was amended; all references are to the amended final judgment.

[9] Although the jury had returned a verdict of $2.3 million, *see supra* at 380, 982 *A.2d* at 424, the trial court, with the consent of the parties, molded the judgment to $2.1 million to correct an admitted error in plaintiff's damages model.

fees' " (quoting *Kellam Assocs., Inc. v. Angel Projects, LLC,* 357 *N.J.Super.* 132, 138, 814 *A.*2d 642 (App.Div.2003)).

Addressing at the outset whether counsel fees were recoverable in this breach of contract action, the Appellate Division reasoned that "even with a strict construction of the definition of loss in the Agreement ... the only reasonable interpretation of the Agreement is that counsel fees may be awarded in connection with litigation under the Agreement." It described the contractual definition of "Loss" as "expansive" and "conclude[d] that an award of counsel fees was contemplated by the terms of the Agreement."

Turning to defendant's two-pronged claim (1) that the counsel fee award was disproportionate to the recovery, and (2) that the trial court had failed to make an adequate reduction to eliminate fees for services related to unsuccessful claims, the panel acknowledged the limited scope of review of counsel fee awards. It recognized that "[a] trial court's counsel fee determination 'will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion' " (quoting *Packard–Bamberger & Co., Inc. v. Collier,* 167 *N.J.* 427, 444, 771 *A.*2d 1194 (2001)). Without distinguishing between contractually based counsel fees claims and statutory, *Rule* or common law based counsel fees claims, it noted that when "successful and unsuccessful claims are related, by either a 'common core of facts' or 'related legal theories,' the court must consider 'the overall relief obtained to determine whether those hours devoted to the unsuccessful claims should be compensated' " (quoting *Kluczyk v. Tropicana Prods., Inc.,* 368 *N.J.Super.* 479, 500, 847 *A.*2d 23 (App.Div.2004)). It also considered "whether the court should have reduced the counsel fee award based on plaintiff's limited success in obtaining a $2.1 million verdict when its initial claim was for $16 million[,]" concluding that " 'when a substantial portion of a claim sought is ultimately rejected, that circumstance should be considered along with other factors' " (quoting *N. Bergen Rex Transp., Inc., supra,* 158 *N.J.* at 573–74, 730 *A.*2d 843). In the end, the panel concluded that there

was no abuse of discretion in the trial court's award of counsel fees or expenses.

Defendant petitioned, and plaintiff cross-petitioned, for certification; both petitions were granted. *Litton Indus., Inc. v. IMO Indus., Inc.*, 195 *N.J.* 522, 950 *A.*2d 908 (2008).

## II.

### A.

Defendant's principal claim is that there is no basis for an award of counsel fees here. That claim cannot be sustained on the record of this appeal.

The general and long-standing rule in New Jersey is that "unless legal fees are authorized by statute, court Rule, or contract, they are not recoverable." *Satellite Gateway Commc'ns, Inc. v. Musi Dining Car Co., Inc.*, 110 *N.J.* 280, 285, 540 *A.*2d 1267 (1988) (footnote omitted). The Agreement clearly and unambiguously contemplates that counsel fees will be part of the contractually defined "Loss" recoverable against a breaching party. The Agreement sets forth a comprehensive, indeed exhaustive list of items that constitute a "Loss"; they are: "all demands, claims, claims for reimbursement, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges, and amounts paid in settlement (including reasonable attorneys' fees and costs incident to any of the foregoing)[.]" No doubt, the explicit inclusion of reasonable counsel fees and costs as part of a defined "Loss" encompasses the claims advanced here. Nothing in the language of the Agreement negotiated by these sophisticated commercial entities limits the recovery of reasonable counsel fees in the manner argued by defendant. Conversely, had those same sophisticated parties intended the result defendant now urges, that limitation would have been expressly laid out within the four

corners of this lengthy and otherwise scrupulously detailed Agreement; it was not.

## B.

Because it was proper for the trial court to award counsel fees under the Agreement, one must turn to defendant's claim in respect of the quantum of counsel fees awarded. That challenge focuses on the methodology by which the trial court calculated the counsel fee award, the fundamental point on which the majority and I differ.

Any consideration of an award of counsel fees "must start from the proposition that New Jersey has a strong public policy against the shifting of costs and that this Court has embraced that policy by adopting the 'American Rule,' which prohibits recovery of counsel fees by the prevailing party against the losing party." *In re Estate of Vayda*, 184 *N.J.* 115, 120, 875 *A.*2d 925 (2005) (citations, internal quotation marks and editing marks omitted). Under the American Rule, "which is the law of this State, a prevailing party may not be granted attorney's fees unless authorized by the parties' contract, court rule, or statute." *Rock Work, Inc. v. Pulaski Const. Co., Inc.*, 396 *N.J.Super.* 344, 350–51, 933 *A.*2d 988 (App.Div.2007), *certif. denied*, 194 *N.J.* 272, 944 *A.*2d 32 (2008) (citations omitted).

Counsel fee awards, as exceptions to the American Rule, fall under four general categories. The primary and most readily recognized form are those counsel fee awards granted pursuant to a fee-shifting statute. *See, e.g., New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corrs.*, 185 *N.J.* 137, 152, 883 *A.*2d 329 (2005) (explaining that "[f]rom matters involving consumer fraud, *N.J.S.A.* 56:8–19, to instances of discriminatory treatment, *N.J.S.A.* 10:5–27.1, the New Jersey Legislature has promulgated a substantial number of statutes authorizing an award of a reasonable counsel fee to the attorney for the prevailing party" (citation and internal quotation marks omitted)). Those statutes

"share a common rationale for incorporating a fee-shifting measure: to ensure 'that plaintiffs with bona fide claims are able to find lawyers to represent them, to attract competent counsel in cases involving statutory rights, and to ensure justice for all citizens.' " *Id.* at 152–53, 883 *A.2d* 329 (quoting *Coleman v. Fiore Bros.*, 113 *N.J.* 594, 598, 552 *A.2d* 141 (1989) (editing marks omitted)).

The second category of counsel fee awards consists of those allowed by court rule. *See In re Estate of Vayda, supra,* 184 *N.J.* at 120, 875 *A.2d* 925 ("In general, *Rule* 4:42–9 codifies those specific instances where, in the absence of a separately enabling statute or contract, fee shifting is permitted."). Thus, for example, *Rule* 4:42–9 allows for counsel fee shifting in eight discrete circumstances: in family actions when permitted under *Rule* 5:3–5(c); out of a fund in court; in certain probate actions; in mortgage foreclosure actions; in tax certificate foreclosure actions; in actions upon a liability or indemnity insurance policy; as otherwise expressly allowed by the *Rules of Court;* and in all cases where statutorily allowed. *R.* 4:42–9(a)(1) to (a)(8).

The third category of counsel fee awards presents a tightly circumscribed common law exception to the American Rule that defies ready description, but may be titled loosely as fiduciary malfeasance cases; that category is summarized as follows:

The evolution from *Saffer v. Willoughby,* [143 *N.J.* 256, 670 *A.2d* 527 (1996)] (allowing as permissible consequential damages the recovery of attorneys' fees incurred in the prosecution of an attorney malpractice case), to *Packard–Bamberger & Co. v. Collier,* [167 *N.J.* 427, 771 *A.2d* 1194 (2001)] (allowing the recovery of attorneys' fees incurred in the prosecution of an attorney misconduct case based on breach of fiduciary duty principles), to *In re Estate of Lash,* [169 *N.J.* 20, 776 *A.2d* 765 (2001)] (allowing attorneys' fees as part of recoverable damages for attorney malfeasance in an action on a surety bond), ultimately led to *In re Niles,* [176 *N.J.* 282, 823 *A.2d* 1 (2003)], where we held that "when an executor or trustee commits the pernicious tort of undue influence, an exception to the American Rule is created that permits the estate to be made whole by an assessment of all reasonable costs against the fiduciary that were incurred by the estate." *Id.* at 298–99, 823 *A.2d* 1.

[*In re Estate of Vayda, supra,* 184 *N.J.* at 122–23, 875 *A.2d* 925 (footnote omitted).]

The final category where counsel fee awards are allowed in derogation of the American Rule is where parties, as a matter of

contract, have agreed to counsel fee shifting. In short, New Jersey recognizes that "a party may agree by contract to pay attorneys' fees." *N. Bergen Rex Transp., Inc., supra,* 158 *N.J.* at 570, 730 *A.2d* 843 (citations omitted). That said, "even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." *Ibid.* (citations omitted). As a practical matter, this category can be further subdivided into two types. First are those contractual provisions that mirror fee-shifting statutes, namely, those instances where the parties have agreed to counsel fee shifting as an adjunct to a dispute resolution choice, *see, e.g., Community Realty Mgmt., Inc. v. Harris,* 155 *N.J.* 212, 234, 714 *A.2d* 282 (1998) (recognizing that "a tenant in New Jersey may contractually agree to pay reasonable legal fees related to an eviction") (citations omitted). Second, and more germane, are those instances where, as here, the parties have bargained for an aggrieved party to recover its counsel fees and costs as part of its contract damages or "losses."

## C.

The traditional and now-standard methodology applicable to ascertaining the quantum of counsel fee claims bears repeating in full:

> As a threshold matter, a plaintiff must be a "prevailing party" to recover an attorney's fee.... Plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. Once it is determined that the plaintiff is a "prevailing party," a two-factor computation determines the "lodestar", that is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation is critical because it provides an objective basis on which to make an initial estimate of the value of a lawyer's services.
>
> Thus, determining the "lodestar" requires two separate inquiries: whether the number of hours of work claimed is reasonable, and whether the hourly rate sought is reasonable....
>
> Once a reasonable number of hours worked and a reasonable hourly rate have been defined, a simple arithmetic calculation multiplying one by the other determines the "lodestar." Ascertaining the "lodestar," however, does not end the

inquiry. Because the determination to award counsel fees and, if so, in what amount, is entrusted to the awarding court's exercise of discretion, the amount of the "lodestar" may be reduced or enhanced.....

[*R.M. v. Supreme Court of New Jersey*, 190 *N.J.* 1, 9–11, 918 *A.2d* 7 (2007) (citations, internal quotation marks and editing marks omitted).]

Different considerations arise, however, when the claim for counsel fees is based on a contract that recognizes those fees as an integral part of the contractually defined damages recoverable by a non-breaching party. In those instances, the initial—but certainly not final—inquiry is common with those of all fee-shifting cases: what is the lodestar, that is, what is a reasonable hourly rate times a reasonable number of hours?

In conducting the lodestar analysis in a contract fee-shifting setting, a trial court should be guided by several overarching principles. Because the counsel fee award must be tethered to a proven breach of contract, only those counsel fees incurred in pursuit of a successful breach of contract claim are recoverable. When, as here, a party is successful in less than all of its claims, those hours related to either unsuccessful contract claims or claims for which counsel fees are not allowed should be excluded from the calculus. *Singer v. State*, 95 *N.J.* 487, 500, 472 *A.2d* 138 (1984) ("While a plaintiff should recover for those hours reasonably related to or supportive of his successful claims, hours devoted to claims that are entirely distinct from the relevant successful claims should be excluded."). That must be so because the allowance of counsel fees as part of contract damages requires a careful and precise analysis: it is a fundamental and time-honored tenet of contract law that a "defendant [in a breach of contract action] is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made." *Donovan v. Bachstadt*, 91 *N.J.* 434, 444, 453 *A.2d* 160 (1982) (citing *Hadley v. Baxendale*, 9 *Ex.* 341, 156 *Eng. Rep.* 145 (1854)). Finally, in determining the lodestar, the trial court must be governed by the factors enumerated in *Rule* 4:42–9(b) and (c) and *RPC* 1.5(a). *See generally Furst v. Einstein Moomjy, Inc.*, 182 *N.J.* 1, 21–22, 860 *A.2d* 435 (2004) (describing

application of *Rule* 4:42–9(b) and *RPC* 1.5(a) as "factors [that] must inform the calculation of the reasonableness of a fee award in this and every case").

Once the lodestar is determined in a contractual fee-shifting case, more is required. Because these sophisticated parties voluntarily determined that counsel fees would be a component of contractually defined damages, one must revert to traditional contract principles for the proper rule of decision.

*Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.*, 191 *N.J.* 1, 921 *A.*2d 1100 (2007), succinctly sets forth the bedrock principles that inform any award of contract damages. As a threshold matter, it explains that " 'judicial remedies upon breach of contract fall into three general categories: restitution, compensatory damages and performance.' " *Id.* at 12, 921 *A.*2d 1100 (quoting *Donovan, supra,* 91 *N.J.* at 443–44, 453 *A.*2d 160). It noted that

> [e]ach of these contract remedies serves a different purpose. Restitution returns the innocent party to the condition he or she occupied before the contract was executed. Compensatory damages put the innocent party into the position he or she would have achieved had the contract been completed. Performance makes the non-breaching party whole by requiring the breaching party to fulfill his or her obligation under the agreement.
>
> [*Id.* at 12–13, 921 *A.*2d 1100 (citation omitted).]

*Totaro, Duffy* observed further that, "[m]ost often, courts award compensatory damages in a breach of contract action" and that "[t]he extent of a damage award, and its connection to the breach, has its origins in English Common Law, arising from the seminal decision in *Hadley v. Baxendale,* 9 *Exch.* 341, 156 *Eng. Rep.* 145 (1854)[.]" *Id.* at 13, 921 *A.*2d 1100 (citations omitted).

Basic principles of contract law control. First, " '[u]nder contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract.' " *Ibid.* (quoting *Pickett v. Lloyd's,* 131 *N.J.* 457, 474, 621 *A.*2d 445 (1993)). Second, "the goal is 'to put the injured party in as good a position as if performance had been rendered.' " *Ibid.* (quoting *Donovan, supra,* 91 *N.J.* at 444, 453 *A.*2d 160) (editing

marks omitted). Third, "in order to be compensable, 'the loss must be a reasonably certain consequence of the breach, the exact amount of the loss need not be certain.'" *Id.* at 14, 921 *A.*2d 1100 (quoting *Donovan, supra,* 91 *N.J.* at 445, 453 *A.*2d 160) (editing marks omitted). Fourth, "mere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief." *Ibid.* Finally, "'proof of damages need not be done with exactitude.'" *Ibid.* (quoting *Lane v. Oil Delivery Inc.,* 216 *N.J.Super.* 413, 420, 524 *A.*2d 405 (App.Div.1987)).

If parties contractually agree that counsel fees are to be included in the quantum of damages to be awarded in a breach of contract action, the question is not limited to whether plaintiff's lodestar—again, "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate[,]" *Hensley v. Eckerhart,* 461 *U.S.* 424, 433, 103 *S.Ct.* 1933, 1939, 76 *L.Ed.*2d 40, 50 (1983)—was correctly computed. Also keenly relevant is whether the counsel fees sought satisfy traditional notions of recoverable contract damages. That long-honored process requires an exploration of whether the type of damages sought were in the contemplation of the parties; whether the amount of damages were reasonably foreseeable; and whether the damages award returns the aggrieved party to the position it would have been in but for the breach. *See Crater v. Binninger,* 33 *N.J.L.* 513, 515 (E. & A. 1869) (explaining that "[t]he principle of justice ... is, that the party injured is to be compensated, at least to the extent that redress is awarded judicially, for the actual loss sustained. The effort is to reach this measure as near as possible, and unless, in cases fit for punitive damages, nothing more than this is to be given").

Those principles require the outright rejection of the notion that a lodestar in a breach of contract case may be eligible for enhancement, as that concept has vitality only in the context of encouraging otherwise reluctant counsel to represent a party in the first instance. *Rendine v. Pantzer,* 141 *N.J.* 292, 339, 661 *A.*2d 1202 (1995). Conversely, because counsel fee awards in contract

cases must nonetheless satisfy the standards for contract damages awards, a contractually based counsel fee award properly should be reduced if it is disproportionate to the damages recovered and, hence, not foreseeable. *Totaro, Duffy, supra*, 191 *N.J.* at 13, 921 *A.*2d 1100. *See, e.g., Peevyhouse v. Garland Coal & Mining Co.*, 382 *P.*2d 109 (Okla.1962) (holding that strip mine operator is not liable for cost to return property to its condition prior to mining operations because restoration cost is disproportionate to proper measure of damages: diminution in value of affected land). Thus, the legal precepts that limit contract damages require, in this instance, that the counsel fees to be awarded be proportional to the amount of contract damages recovered, that is, in contract parlance, that the quantum of the counsel fees must be foreseeable, a conclusion that stands in stark contrast to the principle applicable in statutory or *Rule* fee-shifting cases. *See Furst, supra*, 182 *N.J.* at 23, 860 *A.*2d 435 (stating that, in statutory fee-shifting cases, "there need not be proportionality between the damages recovered and the attorney-fee award itself"). *See also Rendine, supra*, 141 *N.J.* at 336, 661 *A.*2d 1202; *Szczepanski, supra*, 141 *N.J.* at 365, 661 *A.*2d 1232; *Grubbs v. Knoll*, 376 *N.J.Super.* 420, 432, 870 *A.*2d 713 (App.Div.2005); *Scullion v. State Farm Ins. Co.*, 345 *N.J.Super.* 431, 437, 785 *A.*2d 469 (App.Div.2001).

The Special Master, the trial court, the Appellate Division and now the majority have each gauged plaintiff's counsel fee damages claim as a quintessential fee-shifting matter, all without applying the contract-based distinctions drawn here. Also, once the Appellate Division remanded the case for an additional category of damages award to plaintiff on its successful contract claim, there was no final judgment on which to base the counsel fee award, *see R.* 4:42–9(d) (requiring that "[a]n allowance of fees made on the determination of the matter shall be included in the judgment or order stating the determination"), a necessary condition precedent to setting the full amount of plaintiff's damages claim.

When counsel fees are contractually part of a plaintiff's damages claim, the applicable process is simple. The trial court first should face the difficult, dual-layered task of fixing the lodestar: determining a reasonable hourly rate for the services rendered by plaintiff's counsel; setting a reasonable number of hours expended by plaintiff's counsel on plaintiff's behalf, which must include differentiating between work performed by plaintiff's counsel on the successful portion of its case and those efforts plaintiff expended without success; and then multiplying the product of one by the other. The lion's share of that task falls squarely on plaintiff, as it bears both the burden of production and the burden of persuasion in respect of its asserted damages. *See Murphy v. Implicito*, 392 *N.J.Super.* 245, 265, 920 *A.2d* 678 (App.Div.2007) (explaining that "[t]o establish a breach of contract claim, a plaintiff has the burden to show that ... the plaintiff sustained damages as a result" (citation omitted)).

Once the lodestar is determined, the trial court must squarely address the uncertainty inherent in determining the proportionality of a contractually allowed counsel fee award against the damages award plaintiff ultimately recovers. In order to give true meaning to the bargain struck between the parties, and as part of ascertaining whether the quantum of counsel fees are foreseeable, the trial court must weigh the amount of counsel fees determined as the lodestar and conclude whether, on a proportional basis, the size of the counsel fee award was within the contemplation of the parties.[10]

The majority, however, rejects traditional contract principles in favor of its "common core" and reasonableness analysis. Those concepts simply have no place in contract claims. The burden of

---

[10] There is no reason to treat plaintiff's claim for an award of expenses any differently. Therefore, the trial court also should determine whether the expenses claimed by plaintiff as part of its counsel fee award were related to plaintiff's successful claim and reasonable in amount, *and* whether those expenses were foreseeable, that is, whether they are proportionate to plaintiff's ultimate damages recovery.

proof on contract damages rests squarely on the plaintiff. If a contract plaintiff can prove his contract damages and they are foreseeable, they should be recoverable; if he cannot, they should not be. It is wholly inappropriate to allow a contract plaintiff to use—tacitly, if not explicitly—the gimmick of a "common core" to substitute for competent proofs. Similarly, it is wholly inappropriate to tether a contract damages counsel fees-shifting award to the "reasonable expectation of the parties," *ante* at 389, 982 *A.2d* at 430, as that basis fails to address fundamental and available contract remedies: either restitution or compensatory damages. *See Totaro, Duffy, supra,* 191 *N.J.* at 12–13, 921 *A.2d* 1100.

### III.

Although I concur with the majority's rejection of all of the issues raised on plaintiff's cross-appeal, as well as with the remand ordered by the majority for the re-assessment of the counsel fees award, I cannot join with the majority in respect of the methodology to be applied concerning plaintiff's counsel fees claim on remand. That methodology should be defined by its genesis: the contract between the parties. Hence, what should be required is that plaintiff bear the joint burden of production and of persuasion in respect of its counsel fees damages, and that those proofs be examined like all other contract damages claims: what sum is necessary either to return the non-breaching party to the position it was in before the contract was entered into (restitution) or to place the non-breaching party in the position it would have been but for the breach (compensatory damages), provided, of course, any such damages were foreseeable.[11] To that limited extent, I

---

[11] The parties did not challenge the Appellate Division's judgment remanding the case, *see* n. 6, *supra.* Hence, a remand would have followed in any event, and the decision today as to the methodology to be applied in ascertaining the quantum of counsel fees to be awarded only further defines—albeit, in my view, incorrectly—the scope of that remand. That said, because the amount of counsel fees and costs to be awarded must be proportional to the contract damages recovered, a meaningful assessment of the quantity of counsel fee and

must reject the majority's methodology and concur solely in the result requiring further and far more detailed examination of this counsel fees claim.

Justice HOENS joins in this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

costs award can be performed only after final judgment on the contract damages, and not in a piecemeal or interim manner.