**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2441-21

225 LONG AVENUE, LLC,

    Plaintiff-Respondent,

v.

IRON MOUNTAIN INFORMATION
MANAGEMENT, LLC,

    Defendant/Third-Party Plaintiff
    -Appellant.

v.

THE TIME RECORD STORAGE
COMPANY, LLC, and J. KEVIN
GILGAN, Individually,

    Third-Party Defendant.

_____

Argued November 28, 2023 – Decided January 12, 2024

Before Judges Whipple, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-0441-18.

Christopher E. Torkelson argued the cause for appellant (Eckert Seamans Cherin & Mellott, LLC, attorneys; Christopher E. Torkelson and David Patrick Skand, of counsel and on the briefs).

Marc E. Wolin argued the cause for respondent (Saiber, LLC, attorneys; Marc E. Wolin and Michael J. Shortt, on the brief).

PER CURIAM

Iron Mountain Information Management, LLC (Iron Mountain or defendant), appeals from a judgment entered after a four-day bench trial in this commercial landlord-tenant matter. At the conclusion of the trial, Judge Daniel R. Lindemann issued a thorough and detailed statement of reasons in support of the judgment for plaintiff, 225 Long Avenue, LLC (Long Avenue or plaintiff). The statement of reasons also explained the dismissal of defendant's counterclaim and third-party complaint, enforcing provisions of the lease. We affirm.

The record informs our decision. In December 2015, Iron Mountain, executed an asset purchase agreement (APA) with third-party defendant Time Record, LLC (Time Record). Both companies were engaged in the business of secure information management and storage.

The APA had two relevant components. First, defendant took on a portion of Time Record's clients. It received a client list as well as an inventory of

2

A-2441-21

certain boxes containing records corresponding to those clients. Second, defendant entered into a lease agreement with Long Avenue to use a significant amount of warehouse space which contained the above-mentioned records and boxes. Time Record had no previous lease agreement with Long Avenue as they are both owned by third-party defendant, J. Kevin Gilgan. Furthermore, because defendant acquired some—but not all—of Time Record's clients, the boxes it purchased remained intermingled with roughly 59,000 other boxes and other items, which remained Time Record's.

The lease between Iron Mountain and Long Avenue was for a term of two years and applied to several buildings at Long Avenue's Hillside warehouse facility—about 350,000 square feet of space. Defendant took possession on December 30, 2015, with the lease set to end on December 29, 2017.

During the lease term, defendant undertook to relocate the boxes it had purchased to its own facilities, but determining which specific boxes now belonged to Iron Mountain proved challenging. Defendant and Time Record had two different systems for tracking warehouse inventory. Time Record used Total Recall, which tracked the location of each box via a barcode that would be scanned every time a box was moved or added. Time Record's operations manager, James Dowse, later credibly testified as to the system's efficacy.

 A-2441-21

Under the APA, defendant was given access to the Total Recall system for one year at no cost. Despite this, defendant decided to use its own system to track the boxes—Safe Keeper Plus (SKP)—instead of Total Recall. To track the boxes, defendant converted the Total Recall data to SKP, which created a tracking problem. After April 2016, Total Recall no longer tracked the location of the boxes. Defendant then started moving boxes, and since Total Recall stopped tracking the boxes because of the data transfer, neither Time Record nor Long Avenue knew the precise location of any of the boxes.

Defendant sought to move the records to facilities it owned—to that end, it first tried to relocate boxes acquired from Time Record's Trenton facility. Relying on SKP, Iron Mountain sent notice to Long Avenue that the move was complete on August 31, 2016. However, this proved inaccurate as Long Avenue eventually discovered more than 300 boxes belonging to Iron Mountain intermingled with other objects in the Trenton warehouse.

A similar error occurred in the Hillside facility, which forms the basis for the current controversy. Before the lease period ended on December 29, 2017, Iron Mountain attempted to relocate the boxes stored in Hillside. It removed approximately 488,332 boxes by December 27, assuming this constituted the entirety of their clients' possessions stored at the property. After the lease period

4

ended, defendant ceased access, and did not send any employees or processing equipment to the property.[1] However, in the days that followed, when Long Avenue performed an initial cursory check of the premises, they quickly discovered 181 boxes belonging to defendant interspersed amongst the remaining 59,000 boxes at the facility.

In January 2018, Long Avenue notified defendant that numerous boxes of materials were not removed from the premises and told defendant it considered Iron Mountain to be a holdover tenant. The lease provided:

> Surrender of Premises and Holding Over. Upon expiration . . . of this Lease, Tenant shall surrender possession of the Premises to Landlord in broom clean condition, reasonable wear and tear . . . excepted[,] and shall surrender to Landlord all keys for the Premises. . . . Should Tenant . . . Holdover the Premises or any part thereof . . . without Landlord's prior written consent, such holding over shall constitute and be construed as tenancy at sufferance . . . . During the Holdover[2] period Tenant shall continue to pay Additional Rent and

---

[1] Long Avenue continued to permit Iron Mountain to access the facility whenever it requested to do so.

[2] Generally speaking, holding over occurs when a tenant continues "to occupy the leased premises after the lease term has expired," creating a tenancy at sufferance. HOLDING OVER, BLACK'S LAW DICTIONARY (11th ed. 2019). A tenant at sufferance is "one who comes into possession of land by lawful title, usually by virtue of a lease for a definite period, and after the expiration of the period of the lease holds over without any fresh leave from the owner." Xerox Corp. v. Listmark Computer Sys., 142 N.J. Super. 232, 240 (App. Div. 1976) (citing Standard Realty Co. v. Gates, 99 N.J. Eq. 271, 275 (Ch. Div. 1926)).

5

shall pay Base Rent in an amount equal to one hundred
and fifty percent (150%) of the Base Rent . . . .

Defendant replied that the company had already scanned all of the boxes that were located at the premises and did not see any need to re-scan boxes. However, the parties did eventually begin to audit the warehouse inventory in May 2018 and discovered ninety-two boxes belonging to defendant. Defendant then stopped sending employees to assist in the identification effort. Plaintiff continued to scan the 59,000 boxes remaining in the warehouse on its own over the coming months, periodically notifying defendant of its progress. By September 24, 2018, the review was complete: Defendant had left 1,273 boxes at Long Avenue's facility. These boxes were still generating revenue for defendant.

Long Avenue filed a complaint on February 2, 2018, seeking holdover rent, reimbursement for the cost of the audit, as well as damages for a failure to return the leased premises in a broom clean condition. Defendant responded with a counterclaim and asserted a third-party complaint against Time Record and Gilgan individually, alleging a failure to maintain the property during the lease period. The matter was initially arbitrated on September 25, 2019, after which plaintiff filed a request for trial de novo. All subsequent motions for

6

summary judgment were denied, and a four-day bench trial followed from June 21 to July 12, 2021.

At the conclusion of trial, Judge Lindemann, in his written findings stated:

> Here the clear language of the [l]ease defines "surrender" and "holding over" fundamentally on an "all or nothing" basis . . . . Defendant left more than 1,200 boxes at the Hillside facility . . . [I]t is a nonissue if 1,200 boxes . . . constitute "merely" [two percent] of the entire volume of boxes at the Hillside facility at the end of the [l]ease . . . The bottom line is that [d]efendant did leave [those boxes.]

The trial judge further emphasized how defendant's inaction exacerbated the problem:

> That [p]laintiff promptly, at the end of the [l]ease, became concerned that [d]efendant had left some of its boxes . . . and found 181 boxes belonging to [d]efendant is astounding in itself. But what is more concerning . . . is that [p]laintiff notified [d]efendant . . . and [d]efendant picked up the boxes more than <u>three months later</u>—after ignoring [p]laintff's request and its own obligation to retrieve and possess its customers' boxes.

Rejecting defendant's argument that the mere presence of a number of boxes belonging to customer accounts did not mean as a matter of law that Iron Mountain had failed to surrender possession or vacate, the court reasoned, "[d]efendant continued to carry out its mission and conduct[ed] business at [the]

Hillside facility after December 29, 2017 because [it] still legally possessed its 1,273 boxes that it left behind."

The court rejected defendant's contention the boxes were "de minimus." Defendant's business was storing and keeping the boxes. Thus, it did not matter "whether it was one box or 1,200 boxes that were left behind . . . it is the nature of the contents of the boxes . . . that provoke[d] a finding of 'holding over.'" The court concluded the landlord was barred from destroying the boxes under the New Jersey Warehouseman Act and the law of conversion and thus was placed in a delicate situation. Under N.J.S.A. 12A:7-206(c) a warehouse shall deliver the goods to any person entitled to them upon due demand made at any time. Furthermore, the lease provided the option to exercise two three-month periods of extension, which the company failed to take advantage of, even after being promptly notified of the presence of the initially discovered boxes.

As to broom cleaning, the judge reasoned that because the facilities had been partially cleaned prior to the expiration of the lease, defendant knew what it meant to deliver "broom clean" but failed to do so when it left the 1,200 boxes in plaintiff's facility. There was no option in the lease to partially clean the premises, and defendant dragged its feet for several months leading to additional

costs incurred by Long Avenue, rather than respond to the issue when notified by plaintiff.

Judge Lindemann rejected defendant's counterclaims and awarded plaintiff $675,000 for nine months' holdover base rent, plus $227,345.39 in additional holdover rent, a five percent late fee of $225,139.12, and $102,353 for utilities, per the terms of the lease. The court also granted $64,125 in damages for broom cleaning as well as plaintiff's labor costs of $113,089.96 to audit and remove the boxes. Attorney's fees were later calculated and awarded in the amount of $630,687.27. These figures total a final judgment in the amount of $2,037,739 in favor of plaintiff.

This appeal followed.

We apply a deferential standard in reviewing factual findings by a judge. Balducci v. Cige, 240 N.J. 574, 594 (2020). In an appeal from a non-jury trial, "we give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). Issues of law, including the interpretation of contracts, are reviewed de novo. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); Serico v. Rothberg, 234 N.J. 168, 178 (2018).

9

On appeal, defendant first argues the trial court incorrectly concluded its actions constituted a holdover, reiterating the argument that boxes left behind were inconsequential given the majority of boxes were removed on time. It submits there was no holdover because Iron Mountain surrendered possession by removing its employees and equipment on the final day of the lease period. Defendant also contends the boxes caused no actual impediment for plaintiff, and neither prevented a subsequent leasing nor a potential sale of the premises.

Thus, we are tasked with considering the degree to which a prior commercial tenant may leave certain items behind within a previously leased property without being said to still occupy it. In a commercial context, in Union Minerals & Alloys Corp. v. Port Realty & Warehousing Corp., a landlord preemptively brought suit prior to the end of a lease term because of a fear that the tenant would hold over due to the infeasibility of removing a "vast quantity" of large industrial equipment. 129 N.J. Super. 41, 43-44 (Ch. Div. 1974). The court reasoned a "tenant who fails to quit the premises at the expiration of the term is considered a wrongdoer" and the factual circumstances were such that "[u]nless the defendant takes appropriate action now 'with all deliberate speed' it w[ould] be physically impossible . . . [n]ot to breach." Id. at 44-45. Accordingly, the court required the tenant to make the necessary arrangements

to remove the equipment prior to the end of the lease term so the landlord could enjoy its "right to secure possession of the . . . premises." Id. at 46.

Here, the lease required defendant to "surrender possession of the Premises to the landlord" at the conclusion of the lease. The lease specifically contemplated a holdover in the event the premises as a whole "or any part thereof" were not surrendered. As the trial judge observed, defendant's business is the storage and security of the property of third parties, and that by leaving behind boxes, defendant "continued to carry out its mission and conduct[] business at the [property] after" the termination of the lease.

Furthermore, plaintiff knew the boxes were consequential and not the sole property of defendant, instead belonging to various third-party clients. Plaintiff was a party with actual knowledge of the original APA which transferred possession of the boxes to defendant in the first place. Additionally, plaintiff knew that Iron Mountain had left a substantial numbers of boxes behind in other locations in the past. Therefore, plaintiff could not simply treat the boxes as inconsequential detritus left after a complicated move. Instead, plaintiff had an obligation to find out which boxes were which and to make sure that the property was returned to the correct hands. N.J.S.A. 12A:7-206(c); LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div. 2009) ("Conversion . . . [is] an unauthorized

11

assumption and exercise of the right of ownership over goods . . . belonging to another, to the alteration of their condition or the exclusion of an owner's rights." (internal quotation marks omitted)). As a result, while the boxes may not be direct physical analogs of the large industrial machinery contemplated in Union Minerals, they ultimately had a similar effect in that they required plaintiff to undergo substantial effort to remove them prior to being allowed the rightful possession and enjoyment of its property. This is the essence of a tenancy at sufferance. We find no error in the determination of the trial court that defendant was a holdover tenant after the lease ended on December 28, 2017.

Defendant next argues the court erred by awarding damages related to the audit of the premises to locate the boxes which were left behind, because plaintiff lacked any obligation to perform the audit. It asserts the audit was an affirmative, voluntary act for which defendant should bear no responsibility.

Landlords have a duty to mitigate damages caused by a tenant's breach of a lease agreement. See Sommer v. Kridel, 74 N.J. 446, 458 (1977); McGuire v. City of Jersey City, 125 N.J. 310, 320 (1991); Fanarjian v. Moskowitz, 237 N.J. Super. 395, 406 (App. Div.1989). Whether or not a landlord's response is reasonable is a fact-sensitive inquiry; "there is no standard formula for measuring whether the landlord has utilized satisfactory efforts in attempting to

12

mitigate damages, and each case must be judged upon its own facts." Kridel, 74 N.J. at 459. We look to the trial judge's determination to see if the court's findings are supported by sufficient credible evidence in the record. Fanarjian, 237 N.J. Super. at 406.

Here, the trial court explained its decision by observing that plaintiff "could not destroy any boxes that belonged to [d]efendant [due to] obligations and/or responsibilities arising out of the New Jersey Warehouseman Act and conversion." Judge Lindemann determined the audit was necessary to mitigate damages. Plaintiff could not use or sell the premises without understanding exactly which of the roughly 50,000 boxes remaining on the property still belonged to defendant. Neither could the boxes be destroyed as plaintiff knew about the APA, suspected defendant had left boxes behind, and quickly confirmed that to be the case. As such, the trial court held, plaintiff's audit was a reasonable attempt to mitigate and comply with Kridel. We reject defendant's arguments to the contrary.

Next, defendant argues the trial court improperly awarded broom cleaning damages in the amount of $64,125 to plaintiff. Defendant contends plaintiff suffered no actual damage from the lack of broom cleaning, because the

premises were poorly cleaned when Iron Mountain took possession, therefore, broom cleaning damages are unreasonable.

The lease agreement required the premises to be surrendered in broom-clean condition. The court found defendant knew what it meant to deliver the property in "broom clean" condition and the fact defendant left its 1,200 boxes at the facility compels the conclusion that defendant breached its duty.

Defendant also argues the trial court incorrectly denied its counterclaim for $29,611.15 for plaintiff's failure to properly maintain the facility during the lease period. Defendant asserts problems such as water leakage and an infestation of rats and other pests led to damages during their time leasing the facility.

The lease explicitly specified that defendant would take possession in as-is condition. Defendant inspected the property prior to entering into the lease. Section 8.01 of the lease obligated the landlord to "maintain in good condition and repair . . . and in a clean and safe condition . . . the premises . . . ." Crucially, the lease provided if the "[plaintiff] fails to perform its repair and maintenance obligations, then [defendant] shall have the right to make the repair or perform required maintenance upon [ten] days written notice" or upon reasonable notice in an emergency. Defendant never undertook any repairs, nor did it ever file an

insurance claim (as required by the lease in the case of damaged property) regarding any alleged loss or damage to property. Judge Lindemann found defendant's claim meritless, noting the "as-is" language, the lack of insurance claims, and factual issues in the record regarding whether boxes had sustained damage during the lease period or whether such damage was sustained prior to the transfer of possession. We find adequate support in the record to confirm the judge's conclusion.

Finally, defendant submits the trial court erred by awarding attorney's fees. An award of attorney's fees should be upheld so long as provided for by statute, court rule, or contract. Litton Indus., Inc. v. IMO Indus. Inc., 200 N.J. 372, 385 (2009). An Attorney's fee award is also subject to reversal only "on the rarest occasions, and then only because of a clear abuse of discretion." Id. at 386 (quoting Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001)). Courts must consider the factors laid out in Rules of Professional Conduct 1.5 when considering the issue of fees.

The basis for the present award of attorney's fees is contractual. Section 13.02(d) of the lease provides for fee shifting if either party commences litigation with the other and prevails. "A party shall be deemed to have prevailed

. . . if such party obtains substantially the relief sought by it in the action, irrespective of whether such action is prosecuted to judgment."

Judge Lindemann considered a wide variety of evidence to determine the reasonableness of the billing rates for all personnel. He explained the pandemic conditions contributed to scheduling uncertainty, which expanded the amount of hours plaintiff needed to prepare for trial—due to no fault of their own—and addressed nonspecific objections to hours billed for various services, issuing adjustments where warranted. We discern no indication the judge abused his discretion.

Any remaining arguments raised by defendant are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

16