**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1749-22

JARWICK DEVELOPMENTS, INC.,
ADA REICHMANN, and RACHEL
HALPERN, as Executrix of the Estate of
JOSEF HALPERN,

     Plaintiffs-Respondents,

v.

JOSEPH WILF and THE ESTATE OF
HARRY WILF, deceased, individually and
as partners in the partnership known as
J.H.W. ASSOCIATES, LEONARD A.
WILF, ZYGMUNT WILF, MARK WILF,
SIDNEY WILF, RACHEL
AFFORDABLE HOUSING CO.,
HALWIL ASSOCIATES, a partnership,
and PERNWIL ASSOCIATES, a
partnership,

     Defendants-Appellants,

and

MARVIN COHEN, C.P.A., and
MIRONOV, SLOAN & PARZIALE, LLC
f/k/a BECK, WEISS & COMPANY, P.A.,

     Defendants.

_____

Argued November 14, 2024 – Decided December 27, 2024

Before Judges Mayer, Rose and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000184-92.

Peter C. Harvey (Patterson Belknap Webb & Tyler, LLP) argued the cause for appellants (Peter C. Harvey and Peter W. Till, attorneys; Peter C. Harvey and Peter W. Till, on the briefs).

Michael B. Himmel argued the cause for respondents Jarwick Developments, Inc. and Ada Reichmann (Lowenstein Sandler, LLP, attorneys; Michael B. Himmel and Stephanie Ashley, on the brief).

Alan M. Lebensfeld argued the cause for respondent Rachel Halpern, as Executrix of the Estate of Josef Halpern (Lebensfeld Sharon & Schwartz, PC, attorneys; David M. Arroyo and Alan M. Lebensfeld, on the brief).

PER CURIAM

This case returns to us for a third time. In the present appeal, defendants Joseph Wilf, the Estate of Harry Wilf, Leonard A. Wilf, Zygmunt Wilf, Mark Wilf, Sidney Wilf, Rachel Affordable Housing Co., Halwil Associates, and Pernwil Associates (collectively, defendants or Wilfs) appeal from final judgments issued January 4, 2023 entered in favor of plaintiffs Jarwick

2 <span>A-1749-22</span>

Developments, Inc., Ada Richmann (collectively, Jarwick), and Rachel Halpern, as Executrix of the Estate of Josef Halpern (Halpern). Defendants also appeal from an October 13, 2021 order denying their motion to recuse the court-appointed Special Adjudicator Stephen M. Orlofsky.[1] We affirm the judgments for the comprehensive and thorough written reasons expressed by Judge Frank J. DeAngelis. We also affirm the order denying defendants' motion to recuse the special adjudicator for the detailed written statement of reasons issued by Judge Maritza Berdote Byrne.

We have twice issued opinions regarding this partnership dispute involving a garden apartment complex in Montville. See Jarwick Devs., Inc. v. Wilf, No. A-5027-03 (App. Div. Dec. 15, 2006) (Jarwick I); Jarwick Devs., Inc. v. Wilf, No. A-2053-13 (App. Div. June 1, 2018), certif. denied, 236 N.J. 16 (2018) (Jarwick II). Based on these prior opinions, we need not recite the extensive factual and procedural history leading to this appeal. We recite only the facts necessary to give context to our opinion in this matter limited to the remanded issues identified in Jarwick II.

---

[1] At the time former United States District Court Judge Orlofsky was court-appointed for the purpose of issuing reports and recommendations concerning plaintiffs' application for attorney's fees and costs, he was designated "Special Master." In 2024, the title "Special Master" was replaced with the title "Special Adjudicator." Thus, we refer to Judge Orlofsky as "Special Adjudicator."

In Jarwick II, we affirmed the Chancery Division judge's award of $12,624,516 in compensatory damages and $19,435,326 in prejudgment interest to Jarwick on their accounting claim. Jarwick II, slip op. at 47-57. Additionally, we affirmed the Chancery Division judge's factual findings and legal conclusions as to defendants' improper use of partnership funds from the partnership's "inception in 1988 to its dissolution in 2013." Id. at 47, 53. The Chancery Division judge found defendants: took excessive payments from the partnership; improperly collected management fees or expenses; incorrectly recorded interest payments on related-party loans; used partnership funds to pay salaries, benefits, and end-of-the month bonuses to individuals who worked for Wilf-related entities but did little or no work for the partnership; wrongly used partnership funds for rent and other expenses for defendants' headquarters and other office locations; and overcharged the partnership for insurance expenses, legal expenses, advertising costs, and other expenses. Id. at 47-53, 57, 89.

In Jarwick II, we also agreed that Jarwick and Halpern presented sufficient evidence at trial to support their RICO[2] and non-RICO claims but concluded the Chancery Division judge erred in failing to apply the correct statute of

_____

[2] New Jersey Racketeer Influenced and Corruption Organizations Act, N.J.S.A. 2C:41-1 to -6.2.

4                                                                    A-1749-22

limitations to plaintiffs' claims alleging racketeering (RICO), and breach of contract and tort claims (non-RICO).[3]  Consequently, we ordered a limited remand to the Chancery Division judge to:  (1) recalculate non-RICO damages to plaintiffs, limited to damages incurred between October 1, 2003, and December 31, 2011, id. at 29-37, 60; and (2) recalculate RICO damages to plaintiffs, limited to damages incurred between October 1, 2004, and December 31, 2011, id. at 37-41, 64.  On remand, we stated the recalculation of RICO and non-RICO damages should be "based on the trial judge's findings of fact and the accounting damages found by the judge, with such additional submissions or evidence the court deems necessary."  Id. at 64.

Regarding the issue of punitive damages, we vacated the award of such damages to plaintiffs and remanded for the Chancery Division judge to reconsider whether punitive damages should be awarded and, if so, in what amounts.  Id. at 69-71, 89-90.  We explained the judge should have determined whether punitive damages were appropriate based solely on defendants' tortious conduct during the relevant period of limitations.  Id. at 69-70.  We directed the

_____

[3] Plaintiffs' non-RICO claims alleged:  breach of contract; breach of the implied covenant of good faith and fair dealing; breach of fiduciary duties, violations of the Uniform Partnership Act (former and present); common law and equitable fraud; conversion; unjust enrichment; and civil conspiracy.

judge reconsider the award of punitive damages "based on the existing trial court record, any relevant findings of fact found by the trial judge, and such additional testimony or evidence the court may deem necessary for its decision." Id. at 70. In addressing punitive damages on remand, we also directed the judge to:

> make specific findings of fact as to each individual defendant: Zygmunt, Leonard, and Mark. The court shall determine whether each of these defendants engaged in conduct in the period from October 1, 2003, through December [31,] 2011 [on the non-RICO claims and the period from October 1, 2004, through December 31, 2011 on the RICO claims], which rises to the level required for the award of punitive damages. The court then shall decide, as to each defendant, whether punitive damages should be awarded and the amounts to be awarded, considering the criteria in the [Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17,] and the relevant factors under State Farm [Mutual Auto Ins. Co. v. Campbell, 538 U.S. 408 (2003)].
>
> [Id. at 70-71.]

Additionally, we remanded the issue of attorney's fees and costs to the Chancery Division judge. Id. at 71-79, 89-90. We explained:

> On remand, the court shall reconsider and re-determine the amount of attorney['s] fees and costs to be awarded to plaintiffs. The court must limit its award to the fees and costs reasonably devoted to plaintiffs' pursuit of their respective RICO claims.
>
> The court may consider awarding counsel fees and costs for time spent establishing wrongful acts on the

6

part of defendants that pre-dated the time for which the RICO claims could be asserted. However, the court must find that the time devoted to presenting that evidence was reasonably required to establish the RICO claims.

[Id. at 79.]

Importantly, we informed the parties the remand "should not be viewed as an opportunity to relitigate any finding of fact or conclusion made by the trial judge, which has been affirmed on appeal. Those findings are binding on remand." Id. at 70.

Consistent with our remand instructions, the Chancery Division judge issued a November 18, 2019 order again appointing Judge Orlofsky to serve as the special adjudicator to review the parties' submissions in awarding attorney's fees and costs. Although defendants did not object to the appointment of Special Adjudicator Orlofsky the first time, defendants objected to his appointment on the remand because they believed he "got it wrong once before."

Defendants subsequently moved to recuse Special Adjudicator Orlofsky, which plaintiffs opposed. The special adjudicator heard argument on the recusal motion on December 16, 2020, and denied the motion.

Defendants appealed the denial of their recusal motion to the Chancery Division judge. Defendants claimed the special adjudicator had a disqualifying

conflict of interest because he served as a mediator in a separate matter in which Lowenstein Sandler, attorneys for Jarwick in this matter, represented a party in a mediated matter in Monmouth County, entitled Sinatra Properties, LLC v. Berdan Court, LLC, Docket No. C-59-20. Defendants asserted the special adjudicator's serving as a mediator in Sinatra Properties, while simultaneously serving as the special adjudicator in this case, constituted an appearance of impropriety.

The Chancery Division judge denied the recusal motion in an October 13, 2021 order and accompanying written statement of reasons. In her detailed statement of reasons, Judge Berdote Byrne concluded that "Special [Adjudicator] Orlofsky's decision not to recuse himself was correct." She determined it was unnecessary to "reach the issue of whether Special [Adjudicator] Orlofsky erred in refusing to apply the Code of Judicial Conduct ([Code]), because even pursuant to the Code and its concomitant legal standards, Special [Adjudicator] Orlofsky had no reason to recuse."

Further, Judge Berdote Byrne expressed doubt that the Code applied to special adjudicators because judges and special adjudicators had different roles in litigated matters. She noted that "a judge's involvement in any given case is

all encompassing, while a special [adjudicator] is tasked to carry out limited and specific tasks."

Rather than applying the Code, Judge Berdote Byrne concluded "it [was] much more reasonable to apply the Rules of Professional Conduct (RPCs) to [a special adjudicator's] work." As the judge aptly noted, the RPCs no longer applied the appearance of impropriety standard in reviewing an attorney's work on a particular matter. However, even if the appearance of impropriety standard governed Special Adjudicator Orlofsky's conduct, Judge Berdote Byrne concluded he "did not create the appearance of impropriety by accepting and mediating a case in which Lowenstein was involved while also acting as a special [adjudicator] in a case in which Lowenstein was involved."

Judge Berdote Byrne found "[n]o reasonable person would infer Special [Adjudicator] Orlofsky ha[d] a bias from the simple fact he interacted with the same firm more than once." As the judge explained:

> No fully informed reasonable person would conclude Special [Adjudicator] Orlofsky, who has worked on the within matter since 2013 on substantial but specific, discreet issues would be influenced by the referral of two hours of mediation work from Lowenstein such that he would lose the ability to assess the matters in this case impartially and make a non-binding recommendation to the court. Special [Adjudicator] Orlofsky has been working with this case for eight years. Merely recommending him as a mediator in a

two-hour mediation cannot be perceived by any fully informed, reasonable person to cloud his judgment, and his acceptance of that work does not create the appearance of impropriety.

Following the Chancery Division judge's denial of defendants' recusal motion, Special Adjudicator Orlofsky heard argument on plaintiffs' fee application. On August 4, 2022, he issued a comprehensive and exhaustive report and recommendation, addressing attorney's fees and costs consistent with our remand instructions in Jarwick II. On August 25, 2022, Special Adjudicator Orlofsky issued a detailed supplemental report and recommendation, addressing attorney's fees and costs associated with legal work before this court and the New Jersey Supreme Court. Defendants filed objections to Special Adjudicator Orlofsky's reports and recommendations.

On November 15, 2022, Judge DeAngelis heard argument on the remand issues. The following day, Judge DeAngelis entered an order and accompanying thirty-nine-page written statement of reasons addressing the issues we remanded in Jarwick II. Judge DeAngelis meticulously explained his reasoning on each of the remanded issues. Based on his detailed analysis, Judge DeAngelis awarded the following sums to Jarwick[4]: (1) $3,576,312 in base RICO damages

---

[4] The judgment was entered against all defendants except the Estate of Harry Wilf.

for the period October 1, 2004 through December 31, 2011, which he trebled pursuant to N.J.S.A. 2C:41-4(c) to $10,728,936; (2) $3,231,312 in non-RICO damages, plus punitive damages on that sum in the amount of 2.5 times, for $8,078,280; and (3) $11,604,380.76 in attorney's fees and costs. He awarded the following sums to Halpern: (1) $2,607,348 in base RICO damages, for the period October 1, 2004 through December 31, 2011, which he trebled pursuant to N.J.S.A. 2C:41-4(c) to $7,822,044; (2) $3,425,185 in non-RICO damages, plus punitive damages on that sum in the amount of 2.5 times, for $8,562,962.50; and (3) $7,599,188.64 in attorney's fees and costs.

Regarding interest awarded, the November 16, 2022 order provided:

> The damage awards are subject to prejudgment interest up to the date of this [o]rder at a rate of 8.875% until the distribution of partnership assets. After the distribution of partnership assets, prejudgment interest continues to accrue at a rate of 3.935%. Post-judgment interest accrues from the date of this [o]rder at the statutory rate of 2.25%.

On January 4, 2023, Judge DeAngelis entered a final judgment, awarding Jarwick the following:

> (1) $12,624,516 in compensatory damages;
>
> (2) $33,689,845 in prejudgment interest through November 16, 2022, calculated using the equity rate of 8.875%, compounded annually for the period December 13, 2013 through and including July 9, 2014,

and at the average prime rate of 3.935%, compounded annually, for the period July 10, 2014 through and including November 16, 2022;

(3) $2,854.99 per diem in post-judgment interest, from November 17, 2022 and thereafter until fully paid, at the post-judgment interest rate of 2.25% per annum;

(4) $11,604,380.76 in attorney's fees and costs; and

(5) $3,576,312 in RICO damages, trebled to $10,728,936.

Although Judge DeAngelis found punitive damages of $8,078,280 on the non-RICO claims (calculated at 2.5 times the $3,231,312 compensatory non-RICO damages award), he determined the punitive award was not collectible because the RICO treble damages award exceeded the punitive damages award. Judge DeAngelis explained he would "not disturb Judge Wilson's determination that pre-judgment interest should be compounding, as affirmed by the Appellate Division" in Jarwick II.

In a separate January 4, 2023 order, Judge DeAngelis entered a final judgment on Halpern's claims, awarding the following:

(1) $3,425,185 in compensatory damages;

(2) $5,948,025 in prejudgment interest through November 16, 2022;

(3) post-judgment interest on the judgment sums at a rate of 2.25% per annum, from November 17, 2022 until fully paid;

(4) $7,599,188.64 in attorney's fees and investigation costs; and

(5) $8,562,962.50 in punitive damages as follows:

$5,137,777.50 payable by Zygmunt Wilf;
$1,712,592.50 payable by Leonard Wilf; and
$1,712,592.50 payable by Mark Wilf.

Judge DeAngelis similarly found that the $2,607,348 in RICO damages, which were trebled to $7,822,044, was not collectible or payable because it was exceeded by the punitive damages award.

On appeal, defendants raise the following arguments: the judiciary has treated defendants unfairly throughout this litigation; the special adjudicator assigned after our limited remand in Jarwick II had a disqualifying conflict of interest and the Chancery Division judge should have granted their recusal motion; and the Chancery Division judge erred in awarding attorney's fees, punitive damages, and prejudgment interest after the limited remand. We reject these arguments.

13

## I.

Defendants' unfair treatment arguments exceed the scope of our limited remand in Jarwick II. The allegations regarding errors by the judges who handled this case could, and should, have been asserted by defendants in either of the prior appeals. Defendants impermissibly raised claimed judicial errors beyond the issues stated in our limited remand under Jarwick II for the first time in this third appeal.

Further, defendants failed to present any valid arguments for revisiting issues resolved in the prior appeals. While defendants understandably disagree with certain of our prior judicial determinations, absent proof of any errors, the prior judicial rulings are the law of the case, and we decline to address issues other than the remanded issues in Jarwick II. Lombardi v. Masso, 207 N.J. 517, 538 (2011) ("The law of the case doctrine teaches us that a legal decision made in a particular matter 'should be respected by all other lower or equal courts during the pendency of that case.'") (quoting Lanzet v. Greenberg, 126 N.J. 168, 192 (1991)).

## II.

We next consider defendants' claim that Special Adjudicator Orlofsky had a disqualifying conflict of interest. On appeal, defendants reprise the arguments

presented to, and rejected by, Judge Berdote Byrne. We reject defendants' argument on this issue for the reasons aptly stated by Judge Berdote Byrne in her comprehensive written statement of reasons. We add only the following comments.

"[R]ecusal motions are 'entrusted to the sound discretion of the judge and are subject to review for abuse of discretion.'" Goldfarb v. Solimine, 460 N.J. Super. 22, 30 (App. Div. 2019), aff'd as modified and remanded on other grounds, 245 N.J. 326 (2021) (quoting State v. McCabe, 201 N.J. 34, 45 (2010)). A decision constitutes an abuse of discretion where it is made without any rational explanation, or it departs from established law or policy. State v. Chavies, 247 N.J. 245, 257 (2021).

The standard for evaluating a recusal motion is objective: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517 (2008). The answer to this question "require[s] a case-by-case analysis of the particular facts presented." McCabe, 201 N.J. at 46.

Judge Berdote Byrne correctly noted the Code governs sitting judges in New Jersey state courts and has not been applied to special adjudicators, except in Mount Laurel cases. See In re Township of Bordentown, 471 N.J. Super. 196,

230-33 (App. Div. 2022), <u>Deland v. Township of Berkeley</u>, 361 N.J. Super. 1, 12 (App. Div. 2003). As we explained in <u>Deland</u>:

> [The] strict conflict of interest rules should apply to <u>Mount Laurel</u> special [adjudicators]. Although the role of such a[n adjudicator] is advisory only, the [adjudicator]'s recommendations may be highly influential in some circumstances. Moreover, <u>Mount Laurel</u> cases are matters of great public sensitivity. Consequently, the courts must strive to preserve an appearance of complete impartiality in the decision-making process.
>
> <u>Rule</u> 1:12–1(f) provides that "[t]he judge of any court shall be disqualified . . . when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." We conclude that in view of the sensitivity of <u>Mount Laurel</u> cases, the special [adjudicators] who provide recommendations to judges in those cases must be subject to substantially the same conflict of interest rules as judges, including <u>Rule</u> 1:12–1(f).
>
> [361 N.J. Super. at 12.]

We deem it unnecessary to decide whether the Code applies to special adjudicators under these facts. Even assuming the Code applied to Special Adjudicator Orlofsky, under the discrete facts in this matter, Judge Berdote Byrne did not abuse her discretion in denying defendants' recusal motion. We agree that no reasonable, fully informed person would have doubts concerning Special Adjudicator Orlofsky's impartiality.

16

III.

We next consider defendants' arguments regarding the award of attorney's fees and costs. Defendants claim Judge DeAngelis erred in awarding attorney's fees and costs because he awarded fees for: (1) legal work done prior to the assertion of a RICO claim in 2009; (2) work not reasonably required to establish the RICO claims; and (3) plaintiffs' unsuccessful cross-appeals. We disagree.

In remanding the calculation of attorney's fees in Jarwick II, we stated:

> The court may consider awarding counsel fees and costs for time spent establishing wrongful acts on the part of defendants that pre-dated the time for which the RICO claims could be asserted. However, the court must find that the time devoted to presenting that evidence was reasonably required to establish the RICO claims.

[Jarwick II, slip op. at 79 (emphasis added).]

On remand, the Chancery Division judge again referred the award of attorney's fees and costs to Special Adjudicator Orlofsky. The special adjudicator explained he understood our remand ruling to require reconsideration of "whether [p]laintiffs' RICO and non-RICO claims could be considered based upon the same common facts, or otherwise inextricably intertwined, in light of the Appellate Division's decision shortening the applicable statute of limitations for the RICO claims." He "disagree[d]" with

17

defendants' contention that our decision in Jarwick II precluded awarding the entirety of plaintiffs' requested fees and costs, explaining:

> I recognize that the sentence "We are convinced the court erred by finding that all of Jarwick's and Halpern's claims rested on the same common core of operative facts," taken in isolation, would tend to demonstrate otherwise. However, once the context of the sentence is reintroduced, it demonstrates that the basis for that decision was the [t]rial [c]ourt's failure to draw its conclusion with the correct statute of limitations for RICO damages in mind. . . . [T]here is a large distance between the Appellate Division remanding an issue back to the trial court for reconsideration, and the Appellate Division barring the same decision from being made again.
>
> The Appellate Division stated it was "not convinced" that, given the new statute of limitations period, an award of attorney['s] fees that accounted for time used to uncover "wrongful acts committed as far back as 1988" was "justifie[d]." This is unsurprising given that this question within the contours of the 2004 statute of limitations period was not a question raised on appeal, and therefore was not briefed by the parties. Now, with the benefit of the arguments by the parties, . . . I am convinced that this award is justified and make a recommendation for the same attorney['s] fees.

On remand, Special Adjudicator Orlofsky "recommend[ed] that the changed statute of limitations [did] not alter the [t]rial [c]ourt's previous findings regarding the inextricably interlinked nature[] of [p]laintiffs' RICO and non-RICO claims given the common core of facts underpinning both sets of claims."

He further found that "[a] combination of proving the elements of RICO claims, rebutting defenses, and the forensic accounting needed to prove post-2004 damages, demonstrate[d] the RICO and non-RICO claims were intertwined."

Relying on the findings by the original Chancery Division judge, who conducted more than 200 days of trial testimony, Special Adjudicator Orlofsky determined the facts and legal theories underlying plaintiffs' non-RICO claims also supported their RICO claims, and "[t]he fact that the different claims deal with different time periods d[id] not change this analysis, because the facts surrounding those earlier time periods were still relevant to proving the post-October 2004 violations."

Special Adjudicator Orlofsky noted evidence preceding 1994, relating to the formation of the partnership and the partnership's terms, "was imperative to establishing RICO violations within the statute of limitations period," because the predicate acts underpinning the RICO claims required an analysis of whether "[d]efendants [were] authorized to act as they did with the partnership funds." Thus, according to the special adjudicator, "to establish RICO damages for any timeframe, [p]laintiffs still would have had to establish the facts leading to the formation of the partnership regardless of how far that preceded the statute of limitations period." Further, he determined "background information regarding

the various entities involved in the partnership and the [apartment complex] project were relevant to establish that [d]efendants acted within an 'enterprise' as defined by the RICO statute."

Special Adjudicator Orlofsky concluded there were overlapping factual bases for plaintiffs' RICO and non-RICO claims in considering the award of attorney's fees and costs on remand. Additionally, he rejected defendants' request to reduce plaintiffs' fee awards for specific items and provided ample reasons why he rejected the requested reductions. For the reasons expressed in his comprehensive report and recommendation, Special Adjudicator Orlofsky recommended the fee amounts originally awarded.

Subsequently, Special Adjudicator Orlofsky issued a detailed supplemental report and recommendation analyzing plaintiffs' request for additional fees and costs associated with legal work before the Appellate Division and the New Jersey Supreme Court. He again provided comprehensive reasons in support of his recommended award of legal fees and costs incurred on the appeals and awarded an additional $937,912.76 in fees to Jarwick and $738,090.64 to Halpern. In arriving at his recommended attorney's fee award, Special Adjudicator Orlofsky considered the factors under RPC 1.5, reviewed

counsels' time entries, and calculated the recommended compensable fees and costs for plaintiffs' work on the appeals.

The parties objected to the special adjudicator's recommendations on the remanded issue of legal fees and costs. Judge DeAngelis then reviewed the special adjudicator's thorough reports and recommendations and issued an order and accompanying statement of reasons, awarding attorney's fees and costs to plaintiffs. Judge DeAngelis adopted the special adjudicator's awarded fees and costs, ordering payment of $11,604,380.76 to Jarwick and $7,599,188.64 to Halpern. These amounts included all legal work since the start of the case through the entry of the final judgments, including legal work on appeal.

Judge DeAngelis also rejected the "narrowest reading of the Appellate Division's Remand Order," which "would award plaintiffs' attorney[']s fees [only] for the time they devoted to establishing plaintiff's RICO claims starting during the RICO statute of limitations period and going through trial." Judge DeAngelis concluded that, "even with the new limitations period set by the Appellate Division, the attorney's fees award should include fees incurred prior to the beginning of the limitations period," because "the work performed by plaintiffs' counsel prior to October 1, 2004, established the existence of the RICO claim and provided the evidence in support of plaintiffs' RICO claim,"

because "the common law claims were inextricably intertwined with the plaintiffs' RICO claims."

Judge DeAngelis rejected defendants' contention that Special Adjudicator Orlofsky simply rubber-stamped his original report and recommendation as to awarded attorney's fees and costs, finding the special adjudicator provided a reasoned analysis of the record and the law in support of his recommendation that the legal work on the non-RICO claims before October 2004 "was intertwined with and could not be separated from the legal work that resulted in the discovery of the RICO violations." As Judge DeAngelis explained:

> Many facts that pertain to plaintiffs['] non-RICO claims were essential in establishing defendants' violation of RICO. Indeed, it was only after years of discovery and litigation that plaintiffs realized and understood the magnitude of defendants' wrongdoing, and thus amended their Complaints seventeen years after litigation began to include RICO claims. It was during that time (from 1992 to 2009), while pursuing discovery for non-RICO claims, that plaintiffs discovered and established the facts that gave rise to their RICO claims. It would be illogical to state the facts discovered from 1992 to 2009, which gave rise to and informed plaintiffs' understanding that defendants had violated the RICO statute, had nothing to do with plaintiffs' prosecution of their RICO claims. It was precisely because plaintiffs' attorneys tirelessly worked over those seventeen years that plaintiffs were able to prove a pattern of activity that amounted to RICO violations. For those reasons, and the reasons that follow, this court is going to again include attorney['s]

22

fees for time spent before the RICO statute of limitations period because all of that work established a common core of facts that was reasonably necessary to establish plaintiffs' RICO claims.

Judge DeAngelis further noted "it [was] nearly impossible to disentangle the hours spent by attorneys (in the [twenty-one] years leading up to trial and in the [twelve] years before the RICO statute of limitations period) working to prove RICO claims and non-RICO claims" because "[s]o many of the same facts and witnesses [were] tied to both RICO and non-RICO causes of action."

Judge DeAngelis also expressly agreed with Special Adjudicator Orlofsky's detailed review of the billing records, conclusions regarding the reasonableness of charges, including for the work before the Appellate Division and the New Jersey Supreme Court, and recommended reductions for certain legal work and costs.

We review an award of attorney's fees and costs for an abuse of discretion. Hansen v. Rite Aid Corp., 253 N.J. 191, 211-12 (2023). Applications for fees and costs are not "an invitation to become mired in a second round of litigation." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 24 (2004). On appeal, "fee determinations by trial courts will be disturbed only on the rarest occasions, and then only because of a clear abuse of discretion." Rendine v. Pantzer, 141 N.J.

292, 317 (1995); see also Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001).

Under Rule 4:42-9(b), in support of an attorney fee application, counsel must submit an affidavit of legal services addressing the factors under RPC 1.5(a). "The affidavit shall also include a recitation of other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, and an itemization of disbursements for which reimbursement is sought." R. 4:42-9(b).

RPC 1.5(a) provides that:

> A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
>
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; [and]

(8) whether the fee is fixed or contingent.

Additionally, a judge reviewing a counsel fee request must determine the "lodestar" fee, which includes the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  Hansen, 253 N.J. at 215-17. A judge's "determination of the lodestar amount is the most significant element in the award of a reasonable fee because that function requires the trial court to evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application." Rendine, 141 N.J. at 335.  In determining the lodestar fee, the judge "should not accept passively the submissions of counsel to support the lodestar amount." Ibid.  A judge is permitted to reduce the lodestar amount by the number of hours not reasonably expended.  Hansen, 253 N.J. at 216-17.

In a remand situation, "a trial judge has the responsibility to comply with pronouncements of an appellate court," Tomaino v. Burman, 364 N.J. Super. 224, 232 (App. Div. 2003), and may not deviate from the terms of the remand, Park Crest Cleaners, LLC v. A Plus Cleaners & Alterations Corp., 458 N.J.

Super. 465, 472 (App. Div. 2019). "Even where manifestly erroneous, the decision on appeal must be enforced as written, and relief from its direction 'can be had only in the appellate court whose judgment it is.'" Tomaino, 364 N.J. Super. at 233 (quoting In re Plainfield-Union Water Co., 14 N.J. 296, 303 (1954)). "[T]he trial court has no discretion when a mandate issues from an appellate court. It simply must comply." Ibid.

A fair reading of Jarwick II reflected our belief that plaintiffs' RICO and non-RICO claims may not have been based upon the same common core of facts, specifically because the claims had different statute of limitations periods, and the accounting claim required consideration of events dating to 1988, which exceeded the period of limitations for RICO claims. However, nothing in Jarwick II required or predetermined a reduction in the awarded fees and costs on remand. Nowhere in Jarwick II did we order a reduction in the awarded fees and costs. We simply directed the issue be reconsidered on remand. Further, on remand, we expressly permitted the Chancery Division judge to "consider awarding counsel fees and costs for time spent establishing wrongful acts on the part of defendants that pre-dated the time for which the RICO claims could be asserted," so long as the judge found "that the time devoted to presenting that

evidence was reasonably required to establish the RICO claims." Jarwick II, slip op. at 79.

Having reviewed the record, including Special Adjudicator Orlofsky's detailed reports and recommendations after the remand, we are satisfied that Judge DeAngelis properly reconsidered attorney's fees and costs as mandated in Jarwick II. Judge DeAngelis did not abuse his discretion given the parameters stated in Jarwick II for reconsidering the award of attorney's fees and costs.

Further, on remand the calculation of attorney's fees and costs reflected consideration of an issue we overlooked in Jarwick II. Specifically, Judge DeAngelis and Special Adjudicator Orlofsky considered the extent to which defendants' asserted defenses to plaintiffs' RICO claims required plaintiffs to establish facts predating RICO's statute of limitations.

The defenses asserted in response to plaintiffs' RICO claims, as well as defendants' counterclaims against Halpern, required an analysis and consideration of historical facts relevant to the time when the partnership began. Specifically, defendants asserted a "claim of right defense" to the RICO claims. In support of this defense, defendants argued they took monies from the partnership honestly and in good faith to "true up" amounts to which they claimed they were entitled based upon their contributions to the apartment

project since the partnership's commencement. Defendants also asserted a right to recover monies allegedly overpaid to Halpern based upon events predating the apartment complex project. Thus, disproving defendants' affirmative defenses to the RICO claims required plaintiffs to review the entirety of the partnership's books, including the time before the statutory period of limitations.

Here, plaintiffs had to disprove defendants took monies honestly and in good faith and prove defendants intentionally misappropriated partnership funds. Thus, plaintiffs had to establish the formation of the partnership and the partnership's operation from its inception to establish defendants' purported "true-ups" were factually unsustainable and unlawful. Plaintiffs did so through their presentation of numerous witnesses who testified regarding the formation of the partnership and its operations, proffering a detailed forensic accounting to uncover defendants' deliberate and conscious pattern and practice of misappropriating partnership money, and rebutting the defense expert's testimony concerning monies allegedly owed to defendants.

On this record, we discern no abuse of discretion in Judge DeAngelis's award of attorney's fees and costs associated with proving the RICO and related non-RICO claims, and disproving defendants' defenses and counterclaims. To meet their burden of proof, plaintiffs had to establish a common core of facts,

including facts predating the RICO statute of limitations. See Hensley v. Eckerhart, 461 U.S. 424, 435 (1983); Singer v. State, 95 N.J. 487, 500 (1984); Garmeaux v. DNV Concepts, Inc., 448 N.J. Super. 148, 156-59 (App. Div. 2016). The contentious and extensive litigation related to pre-RICO-statute-of-limitations matters was largely attributable to defendants' own conduct and litigation strategy.

We also reject defendants' argument that Judge DeAngelis erred in awarding attorney's fees and costs associated with plaintiffs' unsuccessful cross-appeals. The "threshold issue" in determining the reasonableness of a counsel fee award is whether the party seeking the attorney's fees prevailed in the litigation. Packard-Bamberger, 167 N.J. at 444. Whether a party constitutes a prevailing party involves a two-part test: (1) was the lawsuit "causally related to securing the relief obtained"; and (2) was the party seeking fees granted relief that "has some basis in law." Ibid. (quoting N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 570-71 (1999)).

Here, plaintiffs succeeded on their RICO claims and are entitled to a fee award. N.J.S.A. 2C:41-4(c) ("Any person damaged in his business or property by reason of a violation of N.J.S.[A.] 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the

29

cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation."). Further, as Special Adjudicator Orlofsky and Judge DeAngelis determined, plaintiffs' efforts on appeal included affirming their RICO claims and defending against defendants' appellate arguments. Notably, to the extent plaintiffs' appellate work was unrelated to their RICO claims, the special adjudicator reduced their fee requests accordingly and Judge DeAngelis adopted those reductions for the same reasons.

IV.

We next consider defendants' argument that Judge DeAngelis erred in awarding punitive damages because the matter involved a commercial dispute with economic, rather than physical, injuries. Alternatively, defendants contend the judge erred in awarding punitive damages against Leonard and Mark Wilf because these defendants were not engaged in any conduct during the statute of limitations period warranting such damages. Defendants further argue in the alternative that the amount of punitive damages awarded is excessive. We reject these arguments.

The Chancery Division judge who presided over the trial issued a lengthy oral decision setting forth her findings of fact and conclusions of law, including a detailed analysis of the awarded punitive damages. Those findings are

summarized in <u>Jarwick I</u> and <u>Jarwick II</u>. The Chancery Division judge cited overwhelming trial evidence and testimony to support her conclusion that Zygmunt Wilf was the "master chef" of the misdeeds perpetrated against plaintiffs and Mark and Leonard Wilf were not only complicit in Zygmunt's misdeeds but also responsible for their own actions and inactions related to the partnership. As the judge who presided over the trial stated, "I have never seen a case that consisted of such pervasive and monumental breaches [and] wrongdoings as I [have] seen in this case. And that is why I ordered punitive damages."

We affirmed the trial judge's factual findings and conclusions of law related to defendants' misuse and misappropriations of partnership funds. <u>Jarwick II</u>, slip op. at 49-53. We also affirmed the trial judge's rejection of defendants' claimed entitlement to management fees, theoretical management fees, and hypothetical management fees. <u>Id.</u> at 54-56.

However, we vacated the punitive damages awarded to Jarwick and Halpern and remanded for the Chancery Division judge to reconsider whether such damages should be awarded and, if so, in what amounts. <u>Id.</u> at 64-71, 89-90. In our remand decision, we concluded the trial judge erred in calculating the punitive damages award by applying the 2.5 multiplier to the accounting

A-1749-22

damages between 1989 and 2011.  We explained the trial judge should have calculated the punitive damages by applying the multiplier to the damages assessed for the non-RICO tort claims, with those base damages limited to the statute of limitations period identified in Jarwick II.  Id. at 68-70.  We remanded because the judge mistakenly "considered acts that occurred outside the period permitted by the applicable statute of limitations for the non-RICO claims."  Id. at 70.

In our remand decision in Jarwick II, we instructed:

> [T]he trial court shall reconsider the decisions to award Jarwick and Halpern punitive damages.  The court shall determine whether punitive damages should be awarded, and if so, in what amounts.  The court shall make its determinations based on the existing trial court record, any relevant findings of fact found by the trial judge, and such additional testimony or evidence the court may deem necessary for its decision.

We expressly rejected defendants' arguments that the trial judge erred in imposing tort and RICO liability upon Mark and Leonard Wilf, concluding "there is sufficient evidence in the record to support the award of compensatory, punitive, and RICO damages against both Mark and Leonard."  Id. at 80 (emphasis added).  We stated:

> The record does not support defendants' claim that Mark and Leonard only performed ministerial functions

and essentially acquiesced in Zygmunt's management of the partnership.

Rather, the record supports the trial judge's finding that Mark and Leonard engaged in conduct that warrants imposition of liability upon these defendants. In her decision, the judge found that the Wilfs had operated their businesses with cooperation and coordination. The judge noted that they worked with their accountants in determining the monies that were and were not available.

The judge stated that Zygmunt was the "self-described master chef" and was the "overseer" of Rachel Gardens and many other Wilf projects. The judge found, however, that Zygmunt, Mark, and Leonard worked together and operated on consensus.

The judge pointed out that the evidence showed Mark dealt with payroll and benefits, and the hiring of key people. Mark also reviewed the financial statements for Rachel Gardens. Leonard reviewed the project's financial statements and other financial documents.

We therefore reject defendants' contention that there was insufficient evidence for the award of compensatory, <u>punitive</u>, RICO damages, or attorney['s] fees against Mark and Leonard.

[Id. at 80-81 (emphasis added).]

Judge DeAngelis devoted half of his thirty-nine-page written statement of reasons to addressing punitive damages. He ultimately awarded $8,078,280 in punitive damages to Jarwick, representing 2.5 times the compensatory non-

33

RICO damages of $3,231,312. He awarded $8,562,962.50 in punitive damages to Halpern, representing 2.5 times the compensatory non-RICO damages of $3,425,185. We need not repeat Judge DeAngelis's detailed reasons in support of the awarded punitive damages on remand. The judge relied on the trial evidence and testimony, finding defendants stole partnership funds and then attempted to conceal their misdeeds. Regarding the punitive damages assessed against Zygmunt, Mark, and Leonard Wilf, Judge DeAngelis cited multiple instances wherein these individuals misappropriated partnership funds, including deliberate and overt acts as well as failing to act or question the disbursement of partnership funds.

Judge DeAngelis awarded Jarwick punitive damages on their non-RICO claims of $8,078,280. However, he determined that amount was not "collect[i]ble because [Jarwick's] RICO treble damages award [was] more than the punitive damages award." On the other hand, Judge DeAngelis determined Halpern could collect the awarded $8,562,962.50 in punitive damages to be paid by Zygmunt, Leonard, and Mark because that sum exceeded Halpern's treble damages awarded under RICO. The judge apportioned the punitive damages awarded to Halpern as follows: Zygmunt was responsible for $5,137,777.50, and Leonard and Mark each were responsible for $1,712,592.50.

A-1749-22

We review a trial judge's ruling on punitive damages de novo. Rusak v. Ryan Auto., LLC, 418 N.J. Super. 107, 118 (App. Div. 2011). Our review includes questions relating to the constitutionality of the award. Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 436 (2001).

In Jarwick II, we affirmed the trial judge's factual findings and conclusion that punitive damages were appropriately assessed against Mark and Leonard due to their omissions notwithstanding the case involved only financial misdeeds as opposed to physical harm. Jarwick II, slip op. at 47-71, 80-81, 89-90.

On remand to address the award of punitive damages, we did not permit reconsideration of the trial judge's findings and conclusions. We permitted only consideration of whether punitive damages remained appropriate, and if so, in what amount, based upon defendants' behavior during the relevant period of limitations for the non-RICO claims. Id. at 64-71, 89-90. Judge DeAngelis engaged in a detailed and comprehensive analysis of the facts supporting the award of punitive damages as we directed on remand. For the reasons stated in his written decision, Judge DeAngelis's punitive damages awards are amply supported by the trial record and consistent with the governing statutory law. See N.J.S.A. 2A:15-5.12, -5.14.

We reject defendants' arguments that Judge DeAngelis erred in awarding punitive damages because the case involved an economic dispute or there was insufficient evidence to support punitive damages awards against Mark and Leonard. Punitive damages are permissible in cases involving purely financial wrongdoing, or purely financial loss, especially, as in this case, where defendants owed a fiduciary duty to plaintiffs, Albright v. Burns, 206 N.J. Super. 625, 635-36 (App. Div. 1986); Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J. Super. 437, 449 (App. Div. 1976), the wrongdoing was sufficiently reprehensible because it involved trickery or deceit, and the wrongdoing was intentional, repeated, or targeted, at a relatively financially vulnerable person such as Halpern. State Farm, 538 U.S. at 419-20; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575-77 (1996); McConkey v. AON Corp., 354 N.J. Super. 25, 54-56 (App. Div. 2002).

Punitive damages are permitted for a defendant's "acts or omissions." N.J.S.A. 2A:15-5.12(a) (emphasis added). Here, as Judge DeAngelis explained, the omissions by Mark and Leonard Wilf went beyond mere negligence. Judge DeAngelis found their omissions were knowing, willful, and intentionally harmful to plaintiffs, to whom they owed a fiduciary duty, and were extremely profitable to defendants. He found Mark and Leonard intentionally turned a

36

blind eye to Zygmunt's misappropriation of partnership funds, knowing the misappropriated funds would result in significant financial harm to plaintiffs, because it was in Mark and Leonard's self-interest to do so.

We also find no merit to defendants' alternative argument that the punitive damages award was excessive. The award of a 2.5 multiple of the non-RICO compensatory damages is consistent with the statutorily permitted range, see N.J.S.A. 2A:15-5.14(b) ("No defendant shall be liable for punitive damages in any action in an amount in excess of five times the liability of that defendant for compensatory damages or $350,000, whichever is greater."), it is in the single digits, State Farm, 538 U.S. at 425, and it otherwise comports with constitutional due process guideposts as stated by Judge DeAngelis in his written decision.

Based on the record, we are convinced Judge DeAngelis engaged in a detailed and thorough review of the applicable law after considering the facts and applying the clear and convincing evidence standard for awarding punitive damages. Based upon his scrupulous analysis of the record on remand, Judge DeAngelis determined the punitive damages awards were appropriate because of defendants' tortious conduct during the statute of limitations period, in the amount of 2.5 times the non-RICO damages. He also concluded Zygmunt would be responsible for sixty percent of the punitive damages based on his conduct

and Mark and Leonard would each be responsible for twenty percent of the punitive damages.

Judge DeAngelis also engaged in a detailed review of the facts as to each individually named defendant and appropriately applied the statutory factors and due process considerations in awarding punitive damages. We need not restate Judge DeAngelis's detailed reasons for the awarded punitive damages on remand. We are satisfied he correctly considered the State Farm factors and due process guideposts and provided ample support for the awarded amounts based on the record.

V.

We next consider defendants' claim that Judge DeAngelis erroneously awarded prejudgment interest because he awarded compound interest absent any explanation and the interest amount exceeded the standard rate under Rule 4:42-11. We reject these arguments.

After completing the trial, the Chancery Division judge considered prejudgment interest. At that time, the parties' accountants stipulated that the proper, equitable rate for prejudgment interest was 8.875% as "the appropriate rate to compensate the parties for loss of the use of money during the pertinent time period." The parties viewed the 8.875% as the investment rate of return

plaintiffs could have received on the money. The trial judge used 8.875% as the rate for calculating prejudgment interest because the accountants "agreed that was the actual value of the loss of time with the money" and further agreed the interest would be compounded on an annual basis.

In the final judgments, Judge DeAngelis ordered 8.875% in prejudgment interest, compounded annually, to be applied to the non-RICO compensatory damages through the date of the final judgment, December 20, 2013. For Jarwick, the prejudgment interest amounted to $19,435,326 and for Halpern, the prejudgment interest amounted to $10,100,950. Regarding post-judgment interest, after hearing the parties' arguments, Judge DeAngelis ruled post-judgment interest would be applied to the entire judgment at the rate of 2.25% under Rule 4:42-11.

On appeal, we affirmed the $12,624,516 in accounting damages awarded to Jarwick, as well as the prejudgment interest of $19,435,326. Jarwick II, slip op. at 57, 89. We rejected defendants' attacks on the trial judge's factual findings and conclusions regarding the interest awarded. Id. at 47-57. In their appellate arguments raised in Jarwick II, defendants did not challenge the compounded 8.875% prejudgment interest rate. Id. at 13. Accordingly, defendants waived the issue. See R. 2:6-2(a)(6); Green Knight Cap., LLC v. Calderon, 469 N.J.

Super. 390, 396 (App. Div. 2021), aff'd as modified, 252 N.J. 265 (2022). Additionally, nothing in our remand decision in Jarwick II directed the Chancery Division judge to reconsider the amount or rate of prejudgment interest as to either Jarwick or Halpern. Jarwick II, slip op. at 89-90.

On remand, plaintiffs argued:

> the most significant issue[,] . . . that is the issue of interest, what happens between 2013 and when the [c]ourt enters a final judgment this year. We have the time period between 2013 and June 1st of 2018, when the Appellate Division entered its decision; and then we have the time period from 2018 to the present. And as far as the plaintiffs are concerned, [they] are entitled to the 8.875% interest rate for the entire . . . nine-year period, but I will be addressing that as well.

On the interest issue, plaintiffs argued before Judge DeAngelis that it would be "fair and equitable" for the court to apply the 8.875% interest rate through the date of judgment entered on remand because defendants retained funds owed to plaintiffs and the judgment had not been settled or paid. On the other hand, defendants urged Judge DeAngelis to apply the post-judgment interest rate of 2.25% for the entire period after the December 20, 2013 judgment entered by the Chancery Division trial judge. Additionally, defendants argued plaintiffs each received about $30 million from the sale of the apartment complex property after 2013.

Ultimately, Judge DeAngelis applied the 8.875% interest rate, compounded annually, through July 9, 2014, the sale date of the apartment complex property. After that date, Judge DeAngelis applied an interest rate of 3.935%, compounded annually, from the date of sale of the property through November 16, 2022, which was the date the court entered final judgment on remand. He also awarded post-judgment interest at the rate of 2.25% consistent with the court rule.

In his accompanying written statement of reasons, Judge DeAngelis explained his awarded interest amounts. First, with respect to when prejudgment interest ended and post-judgment interest began, Judge DeAngelis stated:

> [T]he Appellate Division remanded both the compensatory and punitive damages awards for recalculation on remand. Based on the Appellate Division's decision, and the applicable case law, the Court finds that pending the accompanying Order, prejudgment interest continues to accumulate. Post-judgment interest could not be applicable as there is no award for post-judgment interest to attach as the Appellate Division vacated almost the entirety of the damage awards.

Judge DeAngelis then addressed the appropriate rates of interest to apply during the prejudgment and post-judgment periods. He relied on the Chancery

41

Division trial judge's ruling applying an 8.875% interest rate through December 20, 2013, and relevant case law. Judge DeAngelis stated:

> [T]he Court finds that until the distribution of the partnership assets to plaintiffs, the 8.875% investment return rate of interest on partnership distributions, that was undisturbed by the Appellate Division's decision, is the appropriate prejudgment interest rate. However, after the distribution of the partnership assets in July 2014, it would be inequitable to continue prejudgment interest at 8.875%. Likewise, applying the much lower post-judgment statutory interest rate of 2.25% would not fairly compensate plaintiffs for the loss of the use of the funds that they were entitled to pending the Final Order. Thus, for the period of time from the distribution of partnership assets (July 2014) to the entry of the accompanying Order (November 16, 2022), prejudgment interest shall accrue at the average prime interest rate for that period of time, 3.935%. By using the average prime interest rate, the plaintiffs get the benefit of what would have been their expected return if they had the money that they were entitled. Further, the post-judgment interest rate applicable to the damage awards is the statutory rate of 2.25%. R. 4:42-11(a).

In the final judgments dated January 4, 2023, Judge DeAngelis calculated prejudgment interest in the amount of $5,948,025 to Halpern and $33,689,845 to Jarwick. In the judgments, he noted: "Final judgment [is] in accordance with the November 16, 2022 order and statement of reasons. The [c]ourt did not disturb Judge Wilson's determination that pre-judgment interest should be compounding, as affirmed by the Appellate Division."

A-1749-22

Here, the parties' non-RICO claims were predominantly asserted under contract principles and equitable theories rather than tort law. As such, the prejudgment interest rule applicable to tort claims under Rule 4:42-11(b) did not apply. Rova Farms Resort, Inc. v. Inv. Ins. Co. of Am., 65 N.J. 474, 504 (1974) (applying equitable rate of prejudgment interest for claim that "sounds in both tort and contract" and stating "we do not think that compensation should be dependent on what label we place upon an action, but rather on the nature of the injury inflicted upon the plaintiff and the remedies requested by him").

An "'award of prejudgment interest on contract and equitable claims is based on equitable principles.'" Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 390 (2009) (quoting County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006)). And "an equity court has discretion in awarding interest." Rova Farms, 65 N.J. at 505. That is, an award of prejudgment interest "is within the sound discretion of the trial court," as is "the rate at which prejudgment interest is calculated." Litton Indus., 200 N.J. at 390. "Unless the allowance of prejudgment interest 'represents a manifest denial of justice, an appellate court should not interfere.'" Ibid. (quoting County of Essex, 186 N.J. at 61). Accord In re Estate of Lash, 169 N.J. 20, 34 (2001); P.F.I., Inc. v. Kulis, 363 N.J. Super. 292, 301 (App. Div. 2003).

Unlike contract actions, prejudgment interest for tort actions is governed by <u>Rule</u> 4:42-11(b). The rule provides, in pertinent part:

> [T]he court shall, in tort actions . . . include in the judgment simple interest, calculated as hereafter provided, from the date of the institution of the action or from a date [six] months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses. Prejudgment interest shall be calculated in the same amount and manner provided for by paragraph (a) of this rule except that for all periods prior to January 1, 1988 interest shall be calculated at [twelve percent] per annum. The contingent fee of an attorney shall not be computed on the interest so included in the judgment.

<u>Rule</u> 4:42-11(b) provides some degree of discretion when awarding prejudgment interest by incorporating <u>Rule</u> 4:42-11(a). <u>Rule</u> 4:42-11(a) provides that "[e]xcept as otherwise ordered by the court or provided by law, judgments, awards and orders for the payment of money, taxed costs and attorney's fees shall bear simple interest." (emphasis added). Reading subsections (a) and (b) of <u>Rule</u> 4:42-11 as a whole, judges may deviate from the otherwise-expected rate of interest when awarding either prejudgment or post-judgment interest. <u>See</u> <u>Johnson v. Johnson</u>, 390 N.J. Super. 269, 276 (App. Div.

2007).  However, under Rule 4:42-11, "compound interest is clearly the exception rather than the rule."  Ibid.

The purpose of prejudgment interest is "compensatory—to indemnify the plaintiff for the loss of what the monies due him would presumably have earned if payment had not been refused."  Rova Farms, 65 N.J. at 506 (emphasis omitted).  "The basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the interest factor simply covers the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled."  Ibid.  "This consideration has controlled, and interest has been imposed even where, as here, the defendant had in good faith contested the validity of the claim."  Ibid.

We reject defendants' argument that the December 20, 2013 final judgment remains final notwithstanding the appeal, subsequent remand proceedings lasting more than five years, and entry of a new final judgment on January 4, 2023.  See, e.g., Township of W. Windsor v. Nierenberg, 345 N.J. Super. 472, 477-79 (App. Div. 2001) (affirming award of prejudgment interest through date of entry of final judgment upon remand from Supreme Court).  See also Bd. of Educ. of Newark v. Levitt, 197 N.J. Super. 239, 248 (App. Div. 1984)

(holding "post-judgment interest cannot start to run until the precise amount of money damages is fixed"). Cf. Baker v. Nat'l State Bank, 353 N.J. Super. 145, 173 (App. Div. 2002) (noting that although Rule 4:42-11(a) "indicates that interest normally shall run from the date of judgment, it also provides a trial court with the discretion to vary the award, in the interests of equity").

In Jarwick II, we partially reversed the December 20, 2013 judgment and required the Chancery Division judge reassess certain of the damages awarded, which necessarily compelled the entry of a new final judgment after completion of the remand proceedings. Thus, the December 20, 2013 final judgment was not final. The final judgments were entered by Judge DeAngelis after completing the remand proceedings on January 4, 2023.

Having reviewed the record, we are satisfied Judge DeAngelis soundly and reasonably exercised his discretion in awarding prejudgment interest. Nor do we discern any manifest denial of justice in the awarded interest. At the conclusion of the 207-day trial, defendants stipulated the 8.875% rate would be applied, and that rate would be compounded annually, through the entry of the post-trial judgment, which was December 20, 2013. Defendants did not challenge application of that prejudgment interest rate, nor its compounding nature in pursuing their original appeal. Further, during the remand proceedings

A-1749-22

after Jarwick II, defendants never argued for a different prejudgment interest rate through December 20, 2013. Thus, we decline to disturb Judge DeAngelis's award of prejudgment interest.

We also reject defendants' argument that Judge DeAngelis abused his discretion in extending the 8.875% compounded interest rate from the time after December 20, 2013, through the date when the apartment complex property was sold in July 2014. Judge DeAngelis appropriately compensated plaintiffs for the time during which the court ordered the sale of the apartment complex property, but defendants adamantly resisted the sale and thus deprived plaintiffs of access to funds to which they were entitled. See Jarwick Devs., Inc. v. Wilf, A-2799-14 (App. Div. June 1, 2018) (affirming denial of defendants' motion to escrow proceeds from sale of the apartment complex property and awarding attorney's fees to plaintiffs); Jarwick Devs., Inc. v. Wilf, A-5752-13 (App. Div. June 1, 2018) (affirming award of attorney's fees and costs against defendants for failure to comply with the court-ordered sale of the apartment complex property). Based on these facts, Judge DeAngelis did not abuse his discretion in awarding 8.875% compounded interest through July 2014. See Musto v. Vidas, 333 N.J. Super. 52, 72-75 (App. Div. 2000) (affirming award of prejudgment interest at prime rate, compounded); Township of W. Windsor, 345

N.J. Super. at 477-79 (affirming award of prejudgment interest at prime rate, compounded, through final judgment entered after remand, as well as post-judgment interest at prime rate); Tobin v. Jersey Shore Bank, 189 N.J. Super. 411, 416-17 (App. Div. 1983) (holding that although prime lending rate was "[i]n most cases" appropriate for wrongfully withheld funds, in this case the evidence supported applying passbook rate).

In awarding interest for the time between July 2014 and November 16, 2022, Judge DeAngelis copiously explained his reasons for applying a 3.935% compounding rate. He concluded applying the post-judgment rate of 2.25% under Rule 4:42-11 "would not fairly compensate plaintiffs for the loss of the use of the funds that they were entitled to pending the Final Order," whereas 3.935%, which was "the average prime interest rate for that period of time," would provide plaintiffs with "the benefit of what would have been their expected return if they had the money that they were entitled." We discern nothing unreasonable or inequitable about Judge DeAngelis's decision based on this record. Further, Judge DeAngelis relied on the prejudgment interest ruling by the trial judge, which was based on the parties' agreement that a compounding rate was necessary to fairly reflect the investment rate of return expected by sophisticated businesspeople engaged in the type of investment at issue in this

litigation. We agree that a compounding rate was appropriate under the circumstances presented. Musto, 333 N.J. Super. at 72-75.

To the extent we have not addressed any arguments raised by defendants, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1749-22